REVISED, August 4, 1998

**UNITED STATES COURT OF APPEALS**
**For the FIFTH CIRCUIT**

_____

No. 97-60153
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

SANTONIO LAMOND WALKER AND JERRY LEE QUINN,

Defendants-Appellants.

_____

Appeals from the United States District Court
For the Northern District of Mississippi

_____
July 28, 1998

Before POLITZ, REYNALDO G. GARZA, and DENNIS, Circuit Judges.

Dennis, Circuit Judge:

A Federal Grand Jury returned a three-count indictment charging defendant-appellant Jerry Lee Quinn with one count of suborning Santonio Lamond Walker to commit perjury, in violation of 18 U.S.C. § 1622 (Count 1), and charging defendant-appellant Walker with two counts of knowingly making false material declarations while under oath, in violation of 18 U.S.C. § 1623(a) (Counts 2 and 3). The indictment was based on Walker's allegedly false testimony

on Quinn's behalf in the trials of a felon in possession of a firearm charge against Quinn.[1]  Walker moved for severance, but the motion was denied.  After a jury trial, Quinn and Walker were found guilty on all three counts.  At sentencing, Quinn received 24 months imprisonment as to Count 1 of the indictment, while Walker received 24 months each as to Counts 2 and 3, to run concurrently.

Walker appeals, alleging: (1) The admission of four out-of-court statements by his codefendant, Quinn, violated his Sixth Amendment right to cross-examination (i.e., a *Bruton* violation [2]); (2) the trial court erroneously denied his motion for severance in light of the alleged *Bruton* violation; (3) the evidence was insufficient to support his convictions; and (4) his offense level calculated for purposes of the United States Sentencing Guidelines (U.S.S.G.) was improperly based on the underlying offense of possession of a firearm.

Quinn also appeals, alleging: (1) Admission of an out-of-court statement by his codefendant, Walker, was a *Bruton* violation; (2) testimony about Quinn's attempt to suborn perjury from someone other than Walker was improperly admitted because it was evidence of "other acts" not admissible pursuant to Federal Rule of Evidence 404(b); and (3) admission of statements made by Quinn to a

---

[1] *See United States v. Quinn,* Criminal Number 1:95CR083-S, *aff'd, United States v. Quinn,* No. 96-60089, summary calendar, 101 F.3d 697 (5th Cir. 1996).

[2] Referring to *Bruton v. United States,* 391 U.S. 123 (1968), which held that a defendant's Sixth Amendment right to confront a witness is violated by the admission of a non-testifying codefendant's out-of-court, inculpatory statement, and that the violation cannot be cured by a jury instruction.

jailhouse informant violated his Sixth Amendment right to counsel.

Having considered each alleged point of error, we affirm.

## Facts

On May 12, 1995, Jerry Lee Quinn was under surveillance by Aberdeen (Mississippi) Police Officer Pete Conwill and Bureau of Alcohol, Tobacco and Firearms Agent Joey Hall pursuant to their investigation of Quinn for possession of a firearm by a convicted felon.[3] Quinn detected their surveillance and fled. Conwill and Hall pursued a black and gold Pontiac Grand Am, which they believed to be driven by Quinn. Conwill attempted to apprehend the driver of the Grand Am at an impromptu roadblock. The Grand Am driver avoided the roadblock, however, by speeding in reverse around a corner into the yard of James Kilan, abandoning the Grand Am, and fleeing on foot. After impounding the Grand Am, police found a loaded 9mm semiautomatic handgun in the backseat armrest. Further investigation led to the arrest of Quinn for possession of a firearm by a convicted felon.

At Quinn's first firearms possession trial, Santonio Lamond Walker, an acquaintance of Quinn's, testified that he, and not Quinn, had been driving the Grand Am on May 12, 1995 during the pursuit by Hall and Conwill. The jury deadlocked. At Quinn's second firearms possession trial, Walker again testified that he had been driving the Grand Am during the chase. Quinn was convicted in the second trial.

---

[3]*See* 18 U.S.C. § 922(g)(1).

Suspecting that Quinn had suborned Walker's perjury in the firearms possession trials, Hall asked Quinn's cellmate, Rodney Seaton, to be attuned to anything Quinn might say about his recent trial, but not to initiate any conversation with Quinn; Hall gave Seaton no details concerning the investigation of Quinn. On Thanksgiving night, Quinn volunteered to Seaton that he should not be in jail because his "home boy" had "stood up in court and took the rap for him being in the car." After Quinn volunteered this information, Seaton asked him if he was driving the car during the chase, to which Quinn replied that he was, but that his "home boy" had claimed to be the driver. Seaton relayed this information to Hall, which, along with the results of further investigation, led, eight months later, to the indictments of Walker for perjury and Quinn for subornation of perjury.

The government presented its evidence in two stages of a joint trial of the charges against Walker and Quinn. The first stage of the government's case addressed whether Walker had knowingly made false material declarations while under oath as a witness in Quinn's firearms possession trials. Seaton testified that Quinn, in his jailhouse statements on Thanksgiving night, said that Walker had "taken the rap for him" in the firearms possession trials, and that the police were unaware that his "home boy" was not the driver of the Grand Am because its windows were darkly tinted. Hall testified that, during the car chase, when he pulled his vehicle's left side up to the Grand Am's left side at an intersection, the driver of the Grand Am, whom Hall identified definitely as Quinn,

4

rolled down his window and looked at him. Conwill testified that he blocked the road with his car after seeing the Grand Am approaching from behind, and got out of his car to apprehend the driver. When he was close enough to the Grand Am to place his hand on its hood, the Grand Am backed around the corner. Conwill testified, however, that he was able to see through the tinted glass and identify Quinn as the driver and sole occupant of the car. Conwill further testified that, in a separate municipal court trial related to the chase, Quinn offered two different exculpatory stories regarding driving the Grand Am on the day of the chase; each story related that Quinn had driven the Grand Am to a mechanic (the first story related that the mechanic was in Columbus, Mississippi, and the second story changed the mechanic's location to Aberdeen), and neither story involved Walker's driving the Grand Am at any point.

Although James Kilan testified that he was not positive that Quinn was the driver who abandoned the Grand Am in his yard, he described the driver as resembling Quinn but not Walker. Barbara Byrd, the court clerk of the city of Aberdeen, testified that Walker was in the City Court appearing on two unrelated matters on the day and at the time of the chase. Robert Taylor, an acquaintance to both Walker and Quinn, testified that, in a conversation prior to the firearms possession trial, Quinn had admitted to having driven the Grand Am during the chase. The foreman of the jury that convicted Quinn of the firearms violation testified that the identity of the driver was a major issue in

5

determining whether Quinn possessed the firearm found in the Grand Am's backseat armrest. The transcripts from the two firearms possession trials were entered as evidence, demonstrating that Walker had testified under oath that he was the driver of the hotly pursued Grand Am.

The second stage of the prosecution's case addressed whether Quinn had knowingly acted to suborn Walker's false testimony. Taylor testified that Walker told him in a conversation after Quinn's firearms possession conviction that he testified falsely that he was driving the Grand Am, and that Quinn promised to give him $5,000 and two ounces of cocaine if Quinn was acquitted of the firearms possession charges. Taylor also testified that Quinn had tried to persuade him to testify falsely at the firearms possession trial that he, not Quinn, was the driver of the Grand Am.

Neither Walker nor Quinn testified at the perjury/subornation trial.

## Analysis

I. Walker's appeal

A. The alleged *Bruton* violation.

"'[T]he right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him' secured by the Sixth Amendment." *Bruton v. United States*, 391 U.S. 123, 126 (1968) (quoting *Pointer v. State of Texas,* 380 U.S. 400, 404 (1965)). Where an out-of-court statement by a non-testifying codefendant is admitted, the defendant inculpated by the

6

statement is denied the opportunity to cross-examine his codefendant, thus leaving the reliability of the codefendant's statement untested. Therefore, the inculpated defendant is denied his constitutional right to confront the witnesses against him. *Bruton*, 391 U.S. at 127 (citing *Douglas v. State of Alabama*, 380 U.S. 415, 419 (1965)); *see also United States v. Wilson,* 116 F.3d 1066, 1083 (5th Cir. 1997) (examining a possible *Bruton* violation). This type of constitutional violation is termed a *Bruton* violation after the case of *Bruton v. United States* in which the Supreme Court held that a curative instruction for the jury to consider an inculpatory statement only in determining the confessing codefendant's guilt, rather than that of the non-confessing inculpated defendant, does not cure the Sixth Amendment violation. *See Bruton* 392 U.S. at 131.

There are two well-established exceptions to the *Bruton* rule, however. First, *Bruton* only applies to out-of-court statements that are "facially incriminating." *Richardson v. Marsh,* 481 U.S. 200, 209 (1987). Therefore, for a *Bruton* violation to occur, the codefendant's statement must *directly* implicate the defendant. Where the reference to the defendant is indirect and the jury can only complete the inference by relying on other evidence in the trial, *Bruton* will not apply. *United States v. Wilson*, 116 F.3d 1066, 1083 (5th Cir. 1997) (where reference to the defendant is as "the man with the sack," the reference was not sufficient to trigger a *Bruton* violation); *but see Gray v. Maryland,* --- U.S. ---, 118 S. Ct. 1151, 1152 (March 9, 1998) (where a direct implication

7

of the defendant is redacted by replacing defendant's name with an obvious indication of deletion, a *Bruton* violation is not avoided).

The second established exception to *Bruton* is a statement that falls within certain "firmly rooted hearsay exception[s]." *Ohio v. Roberts,* 448 U.S. 56, 66 (1980); *see also United States v. Saks*, 964 F.2d 1514, 1525 (5th Cir. 1992). For example, in *Saks*, this court held that Federal Rule of Evidence 801(d)(2)(D), the agency exception, was one such "firmly rooted" exception, and identified other "firmly rooted" hearsay exceptions that qualify as *Bruton* exceptions, viz. the hearsay exception for co-conspirators provided in Rule 801(d)(2)(E), the "spontaneous declaration" exception, and the "medical examination" exception. *Saks,* 964 F.2d at 1525.

Walker contends that a *Bruton* violation resulted from four out-of-court statements by Quinn, contained in the testimonies of Taylor, Seaton, and Conwill. At issue are Quinn's statements to Taylor that he was driving the Grand Am during the chase, to Seaton that Quinn's "home boy" had taken the rap for Quinn in court, to Seaton that the Grand Am's darkened windows prevented the police from seeing that his "home boy" was not the driver, and to the municipal court, as reported by Conwill, that Quinn was driving the Grand Am on the morning of the chase. The testimony of Taylor and Conwill was admitted over Walker's *Bruton* objections. We review these possible *Bruton* violations for abuse of discretion. *United States v. Fletcher,* 121 F.3d 187, 197 (5th Cir. 1997). We review the introduction of the second-hand statements testified to by Seaton for plain error, however, because there was no objection to

8

their admission.

Regardless of the standard of review, however, the district court did not commit error in allowing any of these statements into evidence against Walker. None of them directly implicates Walker in perjuring himself during Quinn's firearms possession trials. Thus, with respect to Walker, each of the statements fall squarely within the *Richardson* exception to *Bruton*. Neither Quinn's statement to Taylor nor Conwill's testimony about Quinn's municipal court statements, that he was the one driving the Grand Am, directly inculpate Walker in perjury. They reflect that Quinn said in municipal court that he was driving the Grand Am, and do not refer, directly or indirectly, to Walker or to his testimony in the firearms possession trials.

Quinn's statements to Seaton that his "home boy took the rap for him" and that his "home boy" was not driving the car do not facially implicate Walker. *See United States v. Basey,* 816 F.2d 980, 1005 (5th Cir. 1987) (the out-of-court statement must "clearly implicate the codefendant"). To deduce inculpation of Walker from Quinn's statements about his "home boy" would require the jury to draw inferences from other evidence at the trial. *See Wilson*, 116 F.3d at 1083 (finding no *Bruton* violation where other evidence from trial was necessary to complete inference that person referred to in testimony as "man in the sack" was defendant). Because the identity of Walker within the statement by Quinn is not evident on the face of the statement, the statement falls within the *Richardson* exception to *Bruton*.

9

Therefore, because the four out-of-court statements by Quinn of which Walker complains fall within the well-established *Richardson* exception, we conclude that their admission did not constitute a *Bruton* violation.[4]

B.  Insufficiency of the evidence.

Walker contends that there was insufficient evidence to support his conviction of perjury.  In considering insufficiency of the evidence claims, the court reviews the evidence to determine whether a rational trier of fact, after considering all the evidence and reasonable inferences drawn therefrom in a light most favorable to the verdict, could have found the defendant guilty beyond a reasonable doubt of the offense charged. *United States v. Carrillo-Morales,* 27 F.3d 1054, 1064 (5th Cir. 1994).

At trial, Hall identified Quinn as the Grand Am's driver when its driver rolled down his window at the intersection and looked at him; Conwill identified Quinn as the driver and sole occupant of the Grand Am when he attempted to apprehend the driver at the improvised roadblock; Byrd, the court clerk, testified that Walker was in City Court at the time of the chase; Kilan's description of

_____

[4] Because we find that Walker's *Bruton* claim is without merit, we must find that his contention that the district court abused its discretion in denying his motion of severance is equally without merit.  *United States v. Park,* 531 F.2d 754, 761-62 (5th Cir. 1976) (denial of severance reviewed for abuse of discretion).  Severance is improper where there is no *direct* incrimination by the codefendant.  *United States v. Beaumont,* 972 F.2d 91, 95 (5th Cir. 1992) ("[s]everance of the trials is proper . . . only in cases where a defendant's statement directly incriminates his or her co-defendants without reference to other, admissible evidence").

10

the driver fit Quinn but not Walker; and the firearms possession trial transcripts reflected that Walker testified that he was driving the Grand Am during the chase.  Viewing this evidence in the light most favorable to the verdict, a reasonable fact finder could have found Walker guilty beyond a reasonable doubt, even in the face of the testimony of three witnesses to the contrary.  In fact, Walker, himself, argues that the contrary testimony would create a reasonable doubt only if Quinn's out-of-court statements to Seaton, Taylor and Conwill were to be excluded as *Bruton* violations*.*  Because there was no *Bruton* violation in the admission of Quinn's statements (which further implicate Walker when taken with the other evidence), and also because of the independent strength of the prosecution's other evidence, we conclude that there was sufficient evidence to support Walker's perjury conviction.

C.   Sentencing Guidelines.

Section 2J1.3 of the U.S.S.G. applies to, *inter alia*, a sentence based on a conviction for perjury.  However, § 2J1.3 also provides that "[i]f the offense involved perjury, . . . apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the result is greater than that determined above."  Section 2X3.1 provides for a base offense level of six levels lower than the offense level for the underlying offense.  The district court found the underlying offense of Walker's perjury to be Quinn's firearms possession (base offense level of 22), which made

11

for a perjury base offense level for Walker of 16 (one level higher than what would have been applicable under § 2J1.3 without application of § 2X3.1). Walker contends that subornation of perjury should have been the underlying offense used, rather than the firearms possession. This argument is without merit.

In referring to the accessory-after-the-fact guideline, the perjury sentencing guideline essentially directs the sentencing court to determine to what crime Walker's perjury made him an accessory-after-the-fact. That crime was Quinn's firearms possession offense. It was in Quinn's firearms possession trial that Walker perjured himself. Walker's perjury had the potential to help Quinn evade the firearms possession conviction. The counts of the indictment concerning Walker's perjury were based on his testimony at the firearms possession trial. Walker's perjury conviction does not turn on whether Quinn suborned that perjury, but only on whether Walker made false declarations under oath about a material fact in the firearms possession case.[5]

II. Quinn's appeal

A. Alleged *Bruton* violation.

---

[5] We also reject Walker's contention that the offense level increase for a stolen firearm should not apply. The Guidelines mandate the increase, regardless of the defendant's knowledge that the gun was stolen. U.S.S.G. § 2K2.1, Application Note 19; *see also United States v. Singleton,* 946 F.2d 23, 27 (5th Cir. 1991) (holding that defendant's knowledge of whether gun was stolen was irrelevant to court's upward adjustment of sentence for stolen gun); *United States v. Dancy,* 947 F.2d 1232, 1234 (5th Cir. 1991) (remanding for resentencing where the upward level adjustment was not applied to defendant who did not know the gun was stolen).

1. The constitutional violation.

Quinn contends that a *Bruton* violation was triggered by the admission of Taylor's testimony as to Walker's statement that "Quinn was going to pay [Walker] $5,000 and give him two ounces of cocaine if he won the case." Quinn contends that admission of this testimony was a clear violation of his Sixth Amendment right of confrontation as defined by *Bruton*. *Bruton,* 391 U.S. at 127. The government, however, argues that Walker's statement was not offered to prove Quinn suborned perjury, but to show that Walker had knowledge of the perjury and the intent to commit perjury. It is unclear from this argument whether the government is claiming that *Bruton* would not apply in this case because Walker's out-of-court statement does not amount to inadmissible hearsay at all, or whether the government is claiming that Walker's statement, since it was not intended to prejudice Quinn, should be added to the list of "firmly rooted" hearsay exceptions that are also *Bruton* exceptions. Because of this ambiguity, we address both implications.

The Supreme Court has in one case directed that the confession of one defendant, inculpating his codefendant, when not introduced to prove the guilt of that codefendant, may not fall within the purview of *Bruton*. *Tennessee v. Street,* 471 U.S. 409 (1985). *Street*, however, is distinguishable from the instant case in two respects: 1) The implicated codefendant had testified, and the defendant's out-of-court statement was being used specifically to impeach that testimony, not to prove the truth of any of the

13

matters asserted within the out-of-court statement, *id.* at 412, and 2) before the out-of-court statement was introduced, the jury was twice instructed that it was not being introduced to prove the assertions contained within it, but to impeach the codefendant's testimony. *Id.* at 413.

In the present case, however, Quinn did not testify, and the record reveals no attempt to clearly instruct or warn the jury that Walker's out-of-court statement was not being introduced to prove that Quinn had offered Walker cocaine and money to commit perjury, either before it was introduced in Taylor's testimony or at the end of the trial. Where these warnings are absent, we cannot assume that the statement will not be "misused by the jury." *Id.* at 414-15. Because the *Street* court relied on these instructions to the jury to distinguish the holding in *Bruton,* and because such instructions are absent here, we must find that *Bruton* still applies in the present case.

The government argues for expansion of the list of "firmly rooted" hearsay exceptions to include any out-of-court statement that is not introduced to prove the truth of the matter asserted. In seeking to add such an exception to *Bruton*, the government asks us to stretch *Roberts* and *Saks* beyond the scope of their holdings. The Court in *Roberts* makes clear that all of the exceptions to the hearsay rule are not to be considered as exceptions to the guarantees of the Confrontation Clause. *Roberts,* 448 U.S. at 62-63. The Court notes that the hearsay rules are "riddled with exceptions developed over three centuries," and that these

14

exceptions "vary among jurisdictions as to number, nature, and detail." *Id* at 62. When the Court in *Roberts* excepted from the Confrontation Clause guarantee those statements that "fall[] within a firmly rooted hearsay exception," *id.* at 66, it did so with the understanding that every exception to the hearsay rule is not "firmly rooted."

In *Saks*, this court deliberated very cautiously before adding Rule 801(d)(2)(D) to the list of these "firmly rooted" hearsay exceptions. Careful and thorough consideration is required of a court entertaining an argument for a new exception to *Bruton* and the Sixth Amendment. "In all cases the constitutional safeguards are to be jealously preserved for the benefit of the accused, but especially is this true where the scales of justice may be delicately poised between guilt and innocence." *Glasser v. United States,* 315 U.S. 60, 67 (1942) (in considering a Sixth Amendment claim). With this "jealous[] preserv[ation]" in mind, the *Saks* court recognized an addition to the list of "firmly rooted" hearsay exceptions only after evaluating how "rooted in our jurisprudence," *Saks,* 964 F.2d at 1525, was the particular hearsay exception as correlative with an indicia of unquestionable reliability. *Id.* We exercise the same caution in determining whether the government's proffered hearsay exception is "firmly rooted" enough to serve as a *Bruton* exception.

The *Roberts* Court stated that the Confrontation Clause would only countenance "hearsay marked with such . . . 'indicia of reliability which have been widely viewed as determinative of

15

whether a statement may be placed before the jury though there is no confrontation of the declarant.'" *Roberts,* 448 U.S. at 65 (quoting *Mancusi v. Stubbs,* 408 U.S. 204, 213 (1972)). Each of the hearsay exceptions listed by the *Saks* court contains such an indicia of reliability. The agency and co-conspirator exceptions specifically provided for in Rules of Evidence 801(d)(2)(D) and (E), and the medical examination and spontaneous declaration exceptions are all excepted because statements falling within them carry a strong "indicia of reliability."

A stalwart "indicia of reliability" is not inherent in every statement introduced for a purpose other than to prove the truth of the matter asserted, however. The government's proposed addition to the list of "firmly rooted" hearsay exceptions would eviscerate the *Bruton* rule, allowing the introduction of out-of-court statements by unconfronted declarants inculpating the defendant, but having no particular indicia of reliability, so long as they were offered for a purpose other than to prove the truth of the matter asserted. If we allowed this exception to *Bruton,* we would be guilty of not "jealously preserving" the Sixth Amendment "constitutional safeguards," as we are clearly directed to do. *See Glasser,* 315 U.S. at 67. To make such an addition to the list of hearsay exceptions that double as *Bruton* exceptions would be counter to this circuit's deliberately cautious approach in *Saks* and to the Supreme Court's reasoning in *Roberts.* Consequently, we must hold that the admission of Walker's direct implication of Quinn in his out-of-court statement was a violation of Quinn's

16

Sixth Amendment right to confrontation as it is defined in *Bruton,* and therefore an abuse of discretion. *See Fletcher,* 121 F.3d at 197.


2. Harmless Error Analysis.

Since the Supreme Court's landmark decision in *Chapman v. California,* 386 U.S. 18 (1967), in which it adopted the general rule that a constitutional error does not automatically require reversal of a conviction, the Court has applied harmless error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless, including the admission of the out-of-court statement of a non-testifying codefendant in violation of the Sixth Amendment Counsel Clause. *Id., citing, inter alia, Brown v. United States,* 411 U.S. 223, 231-232 (1973). Accordingly, the erroneous admission of Walker's out-of-court statement that directly tended to show Quinn's guilt of subornation will not require reversal of the conviction if the prosecution can "show 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Sullivan v. Louisiana,* 508 U.S. 275, 279 (1993), *quoting Chapman,* 386 U.S. at 24. Thus, "the question [*Chapman*] instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." *Id., citing Chapman, supra,* at 24 (analyzing effect of error on "verdict obtained"). In other words, "[h]armless-error review looks, we

17

have said, to the basis on which the jury *actually rested* its verdict.'"  *Id., quoting Yates v. Evatt,* 500 U.S. 391, 404 (1991) (emphasis added).  The inquiry is "whether the guilty verdict actually rendered in *this* trial was <u>surely unattributable</u> to the error." *Id.* (underline added)*; see also O'Neal v. McAninch,* 513 U.S. 432, 435 (1995) (in conducting a harmless error analysis, the court should examine whether the error affected the jury's verdict)*;* Harry T. Edwards, *To Err is Human, but not Always Harmless: When Should Legal Error be Tolerated?,* 70 N.Y.U. L. Rev. 1167, 1201 (1996) ("*Sullivan* seems to swing the focus of harmless-error analysis back where *Chapman* and *Kotteakos* directed it: to the effect that an error may have had upon the verdict actually rendered").  Applying the *Chapman* standard, we conclude that the prosecution has carried its burden of showing beyond a reasonable doubt that the error complained of did not contribute to the guilty verdict in the case at hand.

The jury's guilty verdict regarding Quinn's subornation of perjury count must reflect a two-pronged finding: (1) That there was false testimony material to the indicted crime, and (2) that the accused said or did something to influence the person providing the false material testimony to do so.  *United States v. Brumley,* 560 F.2d 1268, 1275-76 (5th Cir. 1977).

Quinn does not contest the jury's finding of the first prong, i.e., that Walker testified falsely as to a fact material to proof of the charged offense.  In this particular case, however, because of the nature of the testimony and the kind of relationship between

18

the defendants, evidence relevant to one prong tends to be equally probative as to the other. It is extremely unlikely that a person, who gives intentionally untrue testimony incriminating himself in order to exonerate another, does so without some persuasion or inducement by the beneficiary of his false swearing. Completely uninvited self-incriminating testimony may be somewhat more likely if the witness is closely related to the beneficiary by blood or marriage. Quinn and Walker, however, are merely acquaintances. Consequently, in the present case, every piece of evidence that tends to prove that Walker's self-incriminating testimony was false also tends to prove that Quinn persuaded or induced Walker to so testify in behalf of an acquittal on Quinn's firearms possession charge.

Independently of Wallace's out-of-court statement, the prosecution introduced substantial evidence tending to prove that Quinn instigated, persuaded or induced, and thus suborned, Walker's false testimony: (1) Two eyewitnesses positively identified Quinn as the driver of the Grand Am during the chase; (2) A third eyewitness described the driver as resembling Quinn but not Walker; (3) Quinn's testimony in city court, in an attempt to exculpate himself from separate charges arising from the chase, related that he had driven the Grand Am to a mechanic on the day of the chase, and did not relate that Walker had driven the Grand Am that day; (4) The city court clerk testified that Walker was in court at the time of the Grand Am chase; (5) Taylor testified that Walker admitted to falsely swearing for Quinn; (6) Seaton testified that

19

Quinn claimed his "home boy" had taken the rap for him; (7) Taylor testified that Quinn had attempted to suborn perjury from him before he approached Walker; (8) Walker testified in Quinn's firearms possession case that he drove the Grand Am during the chase and illegally possessed the firearms; (9) the foreman of the jury that convicted Quinn of the firearms violation testified that the identity of the Grand Am's driver was a major issue in determining whether Quinn had possessed the firearms.

A consideration relevant to whether the verdict was "surely unattributable" to the *Bruton* violation is the degree of importance placed on Walker's out-of-court statement by the prosecution in its presentation and argument of the case to the jury. The emphasis, or lack thereof, placed on the statement by the prosecution can affect the perception of that statement by the jurors. *See Delaware v. Van Arsdall,* 475 U.S. 673, 684 (1986) (looking to the importance of the erroneously admitted testimony to the prosecution's case in resolving a harmless error analysis). In its direct examination of Taylor, the prosecution did not specifically ask Taylor whether Walker said that he had been induced to testify by Quinn, or seek to emphasize the portion of Walker's statement referring to Walker's expectation of reward if Quinn were to be acquitted; in Taylor's testimony, that portion of Walker's statement followed a larger portion wherein Taylor related that Walker confessed to testifying falsely at Quinn's firearms

possession trial.[6]  The prosecution did not question Taylor further about Quinn's inducement or persuasion of Walker's testimony, and did not re-visit the issue in its redirect.   In its closing argument, the prosecution did not refer at all to the allusion to a possible reward in Walker's out-of-court statement.[7]

---

[6] Specifically, Walker's statement about Quinn's offer of money and cocaine emerged in Taylor's testimony as follows:

Q: . . . Where did you go after you were playing basketball?
A: I went and found Santonio and asked him if he had testified at Quinn's trial, and he told me yeah.  He told me that he testified that he was driving the car.

[Quinn's attorney objects on the basis of *Bruton,* and is overruled by the court, then:]

Q: What did Santonio Walker say when you asked him had he testified in Quinn's trial?
A: He said he had testified that he was driving the car and that the gun was his.  He said that Quinn was going to pay him $5,000 and give him two ounces of cocaine if he won the case.

[Quinn's attorney asks for a continuing objection, which is granted, then:]

Q: What did Santonio Walker say about what had happened when he testified? . . .

[7] Regarding the subornation count, the prosecution related:

Then Quinn tried to get Robert Taylor to be a witness.  Taylor refused.  The next thing you know is Santonio Walker is that witness.  Then Santonio Walker over in January of this year told Robert Taylor that he lied at Quinn's trial.  You know that Quinn told Rodney Seaton that he had been the one in the car but one of his buddies had testified that it was him instead of Quinn and so he shouldn't be even having a problem with it but that one of his buddies had taken the rap for it . . ..  He persuaded one of his buddies, Santonio Walker, to give perjury.

21

Additionally, no other testimony introduced at the trial had as a foundation information contained in Walker's out-of-court statement. Thus, exclusion of that statement would not have undermined the probative effect of any other evidence.

Considering the error complained of in the context of the entire body of evidence presented by the prosecution, and taking into account the lack of emphasis placed upon the erroneously admitted material by the prosecution and the insignificant effect its exclusion would have had on the government's case, we conclude that the prosecution has shown beyond a reasonable doubt that the error did not contribute to the verdict of guilt of subornation of perjury rendered against Quinn. In other words, Quinn's conviction was "surely unattributable" to the *Bruton* violation. Admission of the statement, therefore, did not constitute reversible error.

B.  Alleged Rule 404(b) violation.

Taylor testified that Quinn approached Taylor and asked him to lie for him in the firearms possession trials. Quinn contends that admission of Taylor's testimony in the subornation of perjury trial was tantamount to admitting evidence of "other crimes," extrinsic to the indicted crime of suborning Walker's perjury in violation of Fed. R. Evid. 404(b). This court reviews admissibility of evidence questions for abuse of discretion. *United States v. Pace,* 10 F.3d 1106, 1114-15 (5th Cir. 1993).

Taylor's testimony is not governed by Rule 404(b), because it

22

did not describe acts extrinsic to those in the indicted crime. Simply stated, an uncharged crime arising from the same transaction should not be considered extrinsic for 404(b) purposes. *United States v. Dula,* 989 F.2d 777 (5th Cir. 1993); *see also United States v. Maceo,* 947 F.2d 1191, 1199 (5th Cir. 1991), *cert. denied,* 503 U.S. 949 (1992). Quinn's attempt to suborn perjury from Taylor was part of the same transaction of shopping for an alibi of which the subornation of Walker's perjury was a part.

In *United States v. Aleman,* 592 F.2d 881 (5th Cir. 1979), this court explained:

> The extrinsic acts rule is based on the fear that the jury will use evidence that the defendant has, at other times, committed bad acts to convict him of the charged offense. In the usual case, the "other acts" occurred at different times and under different circumstances from the crime charged. The policies underlying the rule are simply inapplicable when some offenses committed in a single criminal episode become "other acts" because the defendant is indicted for less than all of his actions.

*Id.* at 885; *see also United States v. Moeller,* 80 F.3d 1053, 1060 (5th Cir. 1996) (where the evidence is not extrinsic, there was no error in admitting it). Because Quinn was seeking to suborn perjury, to gain an alibi for possession of a firearm, all of his actions in attempting to elicit that particular perjury and gain that particular alibi were part of the "same criminal episode."

The district court did not abuse its discretion in admitting

23

this testimony.

C.  Alleged Sixth Amendment violation.

Seaton's testimony about Quinn's Thanksgiving night confession regarded a conversation Seaton and Quinn had while cellmates following Quinn's firearms possession conviction.  Quinn argues that admission of this testimony violated his Sixth Amendment right to counsel.  *See Massiah v. United States,* 377 U.S. 201, 206 (1964) ("[defendant] was denied the basic protections of [the Sixth Amendment guarantee to counsel] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel").  We review constitutional challenges de novo.  *United States v. Asibor,* 109 F.3d 1023, 1037 (5th Cir. 1997); *see also United States v. Hamilton,* 128 F.3d 996, 999 (6th Cir. 1997) (reviewing constitutional challenge to admission of evidence de novo).

We need not address the question of whether admission of Quinn's volunteered statement to Seaton or his answer to Seaton's follow-up question was the product of a deliberate design to elicit incriminating information[8]; there was no violation of Quinn's Sixth

---

[8] *See Kuhlman v. Wilson,* 477 U.S. 436 (1986) (holding that no Sixth Amendment violation had occurred where the defendant's statements to the informant were volunteered and the volunteering of the information was precipitated by events beyond the informant's control); *see also Maine v. Moulton,* 474 U.S. 159, 177 n.13 (1985) (Sixth Amendment right to an attorney violated when the informant "frequently pressed . . . for details of [crime] and in so doing elicited much incriminating information").

Amendment right to counsel because that right had not yet attached at the time of his statements. *See Kuhlman v. Wilson,* 477 U.S. 436, 456 (1986) (right to counsel not violated where Sixth Amendment protections had not yet attached); *United States v. Henry,* 447 U.S. 264, 272 (1980) (same); *Massiah,* 377 U.S. at 206 (same). Sixth Amendment protections are offense-specific. *Maine v. Moulton,* 474 U.S. 159, 180 n.16 (1985); *Hurst v. United States,* 370 F.2d 161, 165 (5th Cir. 1967). In *Kirby v. Illinois,* 406 U.S. 682 (1972), a plurality of the Court concluded that the right to counsel for an offense attaches at the initiating point of the adversarial process.[9] *Id.* at 689; *see also McNeil v. Wisconsin,* 501 U.S. 171, 175 (1991) (right to counsel is offense-specific, not attaching until the commencement of adverse judicial criminal proceedings).

Even without a clear, fact-based delineation marking when the

---

[9] The *Kirby* court reasoned that:

> [t]he initiation of judicial criminal proceedings is far from mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that the defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural law. It is this point, therefore, that marks the commencement of the "criminal prosecutions" to which alone the explicit guarantees of the Sixth Amendment are applicable. *Kirby,* 406 U.S. at 689-90.

25

Sixth Amendment right to counsel attaches,[10] we can determine that adverse judicial criminal proceedings had not commenced at the point when Quinn made his remarks to Seaton. Quinn's admissions to Seaton occurred on Thanksgiving night in 1995. Under the facts of the present case, adverse criminal proceedings on Quinn's subornation offense did not commence until months later. Quinn was indicted for subornation of perjury on July 24, 1996. His initial hearing was not held until August 5, 1996, and counsel was not appointed until August 6, 1996. Under all theories, there was a delay of several months between Quinn's statements to Seaton and the starting point of the adverse criminal judicial proceedings against Quinn on the subornation offense. We conclude, therefore, that Quinn's Sixth Amendment right to counsel had not yet attached with respect to this offense at the time of his Thanksgiving 1995 statements.

Quinn argues, however, that the subornation of perjury charge was "inextricably intertwined" with the firearms possession charge. Where the offense for which incriminating comments are being elicited is inextricably intertwined with an offense to which the Sixth Amendment protections have already attached, those protections cover both offenses. *United States v. Laury,* 49 F.3d

---

[10] The plurality in *Kirby* declined to mark the commencement of adverse criminal judicial proceedings at a particular point, noting that the commencement point has been variously identified as the "formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby,* 406 U.S. at 689; *see also McNeil,* 501 U.S. at 175 (also declining to delineate a fact-based rule of when the Sixth Amendment right attaches).

145, 150, n.11 (5th Cir. 1995) (citing *United States v. Carpenter,* 963 F.2d 736, 740 (5th Cir.), *cert. denied* 506 U.S. 927 (1992)). Quinn maintains that, because the same evidence (concerning whether Quinn was driving the Grand Am) was crucial to both offenses, the firearms possession and the subornation of perjury offenses are inextricably intertwined.

Quinn's reliance on the similarity of the evidence as the standard of whether the two offenses are inextricably intertwined is misplaced. The *Moulton* court identifies the correct standard as whether the conduct leading to each offense is the same. *Moulton,* 474 U.S. at 179-80. Possession of a firearm and subornation of perjury involve two distinct types of conduct, the one not leading necessarily to the other. Also, the distinctly separate offenses of firearms possession and subornation of perjury did not occur within a close temporal proximity. *See Carpenter,* 963 F.2d at 741 (no close relatedness of offenses where the warrant for one predated the events leading up to the warrant for the other).

Using the standards applied in *Moulton* and *Carpenter,* we cannot find that the subornation of perjury charge was so inextricably intertwined with the firearms possession charge that Quinn's Sixth Amendment right to counsel, as triggered by the firearms possession charge, attached also to his subornation of perjury charge at the time of his statements to Seaton. Therefore, there was no Sixth Amendment violation in the admission of any of Quinn's statements to Seaton.

27

## Conclusion

Finding no reversible error in the disposition of this matter by the district court, the defendants' CONVICTIONS and SENTENCES ARE AFFIRMED.