**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 98-20105

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

WENDELL ALBOYD CORNETT AND MARY MARTILLIEA GALLOWAY,

Defendants-Appellants.

---

Appeals from the United States District Court
for the Southern District of Texas

---

November 10, 1999

Before REAVLEY, HIGGINBOTHAM and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

This direct criminal appeal arises from the conviction following jury trial of Appellants Wendell Alboyd Cornett ("Cornett") and Mary Martillea Galloway ("Galloway") for conspiracy to distribute and possess with intent to distribute cocaine and cocaine base in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A). For the reasons assigned, we affirm the convictions and sentences of Appellant Cornett and reverse the conviction and sentence of Appellant Galloway and remand Galloway's

case to the district court for further proceedings consistent with this opinion.

## I.    FACTS AND PROCEDURAL HISTORY

This case presents a complicated set of facts that involve allegations of drug possession and distribution, money-laundering, tax evasion, police corruption and exploitation. The grand jury indicted ten co-conspirators as being part of an elaborate drug conspiracy. Appellants Cornett and Galloway were tried together and convicted of performing various roles in the drug conspiracy.[1] Detailed evidentiary facts will be recounted as necessary in subsequent sections dealing with Appellants' specific claims. Here, we sketch only a general overview of the drug conspiracy.

Cornett owned and operated multiple businesses in the Houston area. Specifically, Cornett owned an automotive detailing shop called the House of Colors and a bowling alley pro shop. Galloway was one of Cornett's girlfriends. The government, believing that Cornett was running an elaborate drug smuggling operation behind the fronts of his legitimate businesses, began a three-year undercover investigation of Cornett and other suspects. In doing so, the government used undercover agents, cooperating witnesses, electronic monitoring and wire taps to gather evidence of Cornett's

---

[1]Cornett and Galloway were tried with two other defendants who were also convicted of participation in the conspiracy. One of these defendants, James Phillips, was granted a new trial by the district court.

drug smuggling operation.

The government began its investigation of Cornett in 1991 when, upon a valid search of an unrelated suspect, records were found indicating that Cornett had received possession of over 200 kilograms of cocaine. Later in 1991 Cornett and Kevin Nixon ("Nixon") purchased the Stadium Bowl pro shop with $13,500 in cash provided by Cornett. To recompense his share of the purchase price, Nixon ran the pro shop and conducted errands for Cornett -- including making deliveries of cocaine and returning with packages of cash. Several witnesses corroborated Nixon's testimony that he had made deliveries of drugs for cash for Cornett operating out of the pro shop.

Cornett used his wife and several girlfriends to assist his drug enterprise. Specifically, his girlfriend Kim Boutte ("Boutte") arranged drug transactions with customers and counted the cash receipts. Gradually Cornett used Boutte less and less, however, as his trust and interest in her waned. The government contends that Cornett then recruited Galloway to oversee the counting and storing of the drug money.

The facts surrounding Galloway's involvement in the drug conspiracy are disputed. The government's witnesses testified as to circumstantial evidence ambiguously suggesting differing degrees of Galloway's involvement with Cornett and his activities. Testimony from Nixon and several drug purchasers suggested that Galloway was responsible for counting the money involved in the

3

drug transactions. Specifically, one witness testified that, when he went to the hair salon where Galloway and Cornett worked for a rendezvous with Cornett, Galloway let him in the front door and escorted him to an upstairs room. He said he entered the room without Galloway and found Cornett counting, in his estimation, over $400,000. An audiotaped statement of a co-conspirator reported that Cornett had made a statement to her in which he mentioned Galloway in connection with "$500,000." Another witness testified that Cornett had told him that Galloway had a money counting machine and had accurately counted sums in excess of $21,000 for him. In an attempt to connect Galloway to the drug money, the government introduced evidence that Galloway received several expensive presents from Cornett, including a fur coat, a custom designed diamond ring and a Mercedes Benz; co-signed an automobile credit application as a reference for Cornett; and on two occasions wrote checks on her own account (for which Cornett supplied the cash) to pay Cornett's creditors. Galloway denied her involvement in the conspiracy, claiming that she had never seen more than $1,000 in cash in her life and that she never owned a money counting machine. It is undisputed, however, that she knew how to operate such a machine from her experience as a bank employee. She testified to her belief that any money or presents she had received from Cornett came from the operations of his legitimate businesses. Galloway's experience in bookkeeping and familiarity with Cornett's legitimate businesses tends to show that

4

she knew Cornett's legal income from them was not sufficient to support their lifestyles.

As Cornett continued to engage in the drug conspiracy, the government arranged for cooperation with several of the participants. By 1995 Cornett had sold large amounts of both powder cocaine and cocaine base to the undercover informants. Prior to these transactions Cornett had evaded police detection of his drug operations with the help of James Phillips, a co-conspirator, who was also a police officer with access to police records and databases.

Through its network of cooperating witnesses and undercover agents, the government compiled evidence of the drug conspiracy -- recording over 100 audio tapes of conversation between the participants. The government argued at the end of the trial that one of these tapes, Exhibit 1.165, directly implicated Galloway in the conspiracy. Exhibit 1.165 involves a discussion between Boutte and a cooperating witness at the bowling alley pro shop. On the tape they discussed several topics -- mostly limited to bowling scores and the appearance of persons on the scene. Part of the tape consisted of Boutte's laments over Cornett's exclusion of her from some of the drug activities and Cornett's relationship with Galloway. While mostly unintelligible, the government contends that this tape directly implicates Galloway because Boutte suggests her belief that Cornett had entrusted Galloway with storing and counting $500,000 of Cornett's drug money. Galloway's counsel

5

objected to the admission of this tape, but the district court allowed the tape to be admitted as statements of co-conspirators in furtherance of the conspiracy under Federal Rules of Evidence 801(d)(2)(e).

Six of the ten indicted co-conspirators pleaded guilty. The remaining four, Cornett, Galloway, Phillips and Henry DeRousselle proceeded to a jury trial. The jury convicted Cornett of all charges except two, and he was sentenced to concurrent life sentences and concurrent forty year sentences. Galloway was convicted on the sole count of conspiracy and sentenced to sixty months imprisonment. Phillips was convicted of conspiracy, but was granted a new trial by the district court. Similar motions for acquittal and for new trial by both Cornett and Galloway were denied. Cornett and Galloway timely appealed their convictions and sentences.

II. CORNETT

Cornett raises multiple issues on appeal, including jury misconduct, right to be present at a juror misconduct hearing, right to cross-examination and ineffective assistance of counsel.[2] We have considered the oral arguments of counsel, reviewed the

---

[2]We do not address the ineffective assistance of counsel argument, however, because an ineffective assistance of counsel argument should not be raised for the first time on appeal except in rare cases where the record is fully developed. *See United States v. Crooks*, 83 F.3d 103, 108 (5th Cir. 1996). This appeal does not present such a case.

6

parties' briefs and the record designated for appeal. The evidence of Cornett's guilt as the leader of the conspiracy is ample and cogent. The issues he seeks to raise on appeal are governed by well-settled principles of law and are meritless. The jury misconduct argument is without merit because Cornett has not demonstrated any prejudice due to the exposure of extrinsic evidence to the jury. *See, e.g.*, *United States v. Kelley*, 140 F.3d 596, 608 (5th Cir. 1998). The commencement of a non-evidentiary hearing regarding possible juror misconduct without Cornett's presence was not reversible error because Cornett had no right to be present at a "conference or hearing upon a question of law" such as the one conducted by the district court,[3] and in any event, any such right was waived by the presence of his counsel.[4] *See, e.g.*, *United States v. Cowan*, 819 F.2d 89, 94 (5th Cir. 1987); *United States v. Provenzano*, 620 F.2d 985, 997 (3rd Cir. 1980). The right to cross-examination argument is without merit because Cornett was allowed sufficient cross-examination "to expose to the jury the

---

[3]*See* Fed.R.Crim.P. 43(c)(3). It is undisputed that once the legal proceeding turned to issues of fact and required cross-examination, the proceeding was halted so that Cornett could be present. Thus, any possible error is at most harmless. *See United States v. Stratton*, 649 F.2d 1066, 1080 (5th Cir. 1981) (citing *United States v. Walls*, 577 F.2d 690, 697) (9th Cir. 1978))

[4]We review only under Federal Rule of Criminal Procedure 43 because "it is clear that there is no constitutional right for a defendant to be present at a conference in chambers concerning dismissal of a juror." *Provenzano*, 620 F.2d at 997 (citing *United States v. Howell*, 514 F.2d 710, 713 (5th Cir. 1975)).

facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *United States v. Restivo*, 8 F.3d 274, 278 (5th Cir.1993), *cert. denied*, 513 U.S. 807 (1994). Accordingly, Cornett establishes no reversible error, and we affirm his convictions and sentences.

III. GALLOWAY

Galloway raises three issues on appeal -- (1) that the district court erred in finding that it lacked jurisdiction to review a motion to reconsider, (2) that the evidence presented was insufficient to establish Galloway's guilt beyond a reasonable doubt, and (3) that the district court erred in admitting Exhibit 1.165 under the co-conspirator definition of non-hearsay in Rule 801(d)(2)(e). Because Galloway's argument on point (3) has reversible merit,[5] we set aside the conviction and sentence of Galloway and remand her case for a new trial.[6]

1.    Sufficiency of the Evidence

---

[5]Since we find the admission of Exhibit 1.165 to be reversible error, we need not address the issue of the timeliness of Galloway's motion to reconsider.

[6]Since we are reversing for a reason other than sufficiency of the evidence, remand is proper because "the accused has a strong interest in obtaining a fair readjudication of [her] guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished." *United States v. Fitzpatrick*, 581 F.2d 1221, 1224 (5th Cir. 1978).

8

Galloway contends that there was insufficient evidence to support her conviction of conspiracy. In considering such claims, the evidence is reviewed "to determine whether a rational trier of fact, after considering all the evidence and reasonable inferences drawn therefrom in a light most favorable to the verdict, could have found the defendant guilty beyond a reasonable doubt." *United States v. Walker*, 148 F.3d 518, 523 (5th Cir. 1998) (citing *United States v. Carillo-Morales*, 27 F.3d 1054, 1064 (5th Cir. 1994)). Under this standard, it cannot be said that the evidence was insufficient to support Galloway's conviction as a matter of law. As discussed *infra*, while the evidence presented a close case against Galloway, taking it and all reasonable inferences in the light most favorable to the verdict, a rational trier of fact could have found Galloway guilty of conspiracy beyond a reasonable doubt. Accordingly, we conclude that there was sufficient evidence to support Galloway's conviction.

2.   Co-Conspirator Statements

This court reviews admission of hearsay evidence under the non-hearsay definition of Rule 801(d)(2)(e) for abuse of discretion.[7] *See United States v. Narviz-Guerra*, 148 F.3d 530, 536

---

[7]If an objection under Rule 801(d)(2)(e) does not specify the grounds for objection, then this court may only review for plain error rather than abuse of discretion. *See United States v. Burton*, 126 F.3d 666, 671 (5th Cir. 1997). Counsel for Galloway objected to the admission of Exhibit 1.165 multiple times -- when first proffered by the government, prior to jury deliberations and in a motion for new trial. Counsel specifically objected to admittance of the evidence because, *inter alia*, it was not "in

(5th Cir. 1998).

Hearsay is not admissible under the Federal Rules of Evidence unless it fits an exception. Fed.R.Evid. 802. However, Rule 801 provides that certain statements which would otherwise constitute excludable hearsay under the general rule of Rule 801(c) are not hearsay by definition. One such definitional non-hearsay is found in Rule 801(d)(2)(e), which provides:

> A statement is not hearsay if . . . the statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Under Rule 801(d)(2)(e), the proponent of admittance must prove by a preponderance of the evidence (1) the existence of the conspiracy (2) the statement was made by a co-conspirator of the party, (3) the statement was made during the course of the conspiracy, and (4) the statement was made in furtherance of the conspiracy. *See United States v. Broussard*, 80 F.3d 1025, 1038 (5th Cir. 1996) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)); *United States v. Means*, 695 F.2d 811, 818 (5th Cir. 1983). There is no dispute as to the existence of the conspiracy, that the statements made in Exhibit 1.165 were made by a co-conspirator or that they were made during the course of the conspiracy -- the only issue properly before the court is whether the statement was "in

_____

furtherance" of the conspiracy. This is sufficient to preserve the challenge on appeal. *Id*. That Galloway did not renew the objection does not alter this result. *Cf*. *Marceaux v. Conoco, Inc.*, 124 F.3d 730, 733 (5th Cir. 1997).

10

furtherance" of the conspiracy.

The legal standards that define the "in furtherance" requirement are well-established. A statement must be "in furtherance" of the conspiracy in order to fit within the non-hearsay definition of Rule 801(d)(2)(e). However, this Circuit has consistently held that the "in furtherance" requirement is not to be construed too strictly lest the purpose of the exception be defeated. *See United States v. Lechuga*, 888 F.2d 1472, 1480 (5th Cir.1989); *United States v. Ascarrunz*, 838 F.2d 759, 763 (5th Cir.1988). This rule is not without its limits, however; a statement is not in furtherance of the conspiracy unless it advances the ultimate objects of the conspiracy. *See United States v. Snyder*, 930 F.2d 1090, 1095 (5th cir. 1991). "Mere idle chatter", even if prejudicial and made among co-conspirators, is not admissible under Rule 801(d)(2)(e). *See Means*, 695 F.2d at 818. Thus, while the in furtherance requirement is not a strict one, it is a necessary one, and the proponent of admissibility must satisfy it by a preponderance of the evidence. *See Broussard*, 80 F.3d at 1038; *see also United States v. Doerr*, 886 F.2d 944, 951 (7th Cir. 1989).

Exhibit 1.165 involves a discussion between Boutte and a confidential informant that took place at the bowling alley pro shop. The tape is over 50 minutes long and the conversation recorded covers many topics. A significant portion of the tape

11

involves discussions between the two co-conspirators on such diverse issues as the bowling prowess of certain friends and relatives, the appearance of some of the patrons at the bowling alley, the merits of certain designer outfits and the respective talents of certain exotic dancers. Amid these conversations, however, occurred the following dialogue which, although mostly unintelligible, was offered to connect Galloway to the conspiracy:

Boutte:          Somebody taking me away from him.

Informant:       Thought you was supposed to be his ace.

                         * * *

Boutte:          ya'll can't be mad cause what's her name never
                 stole for me . . .

Informant:       If you going to bring . . . half a million
                 dollars.  Right ain't going to steal from you
                 and he done counted it  . . .

Boutte:          Now she . . . because she take x amount of
                 dollars with her . . . always comparing me to
                 her likeness . . . he thought she was an
                 angel.

                         * * *

Informant:       She don't know what she's buying into . . .
                 when I called up there yesterday I thought
                 that was you.

Boutte:          He told me he feel like I was just, he feels
                 like I'm using him.  What the hell am I using
                 him . . .

Informant:       It ain't all peach and cream . . .

Boutte:          That's what I told him . . . me and Kevin
                 ain't got no business sitting around talking
                 about his business . . .

                         * * *

12

```
Boutte:            [apparently quoting Cornett] - I don't trust
                   nobody but my wife . . . well I mean there is
                   other ladies I trust but I ain't got to tell
                   you that cause we gonna get into it . . . Mary

Informant:         Mary.
```

The government contends that this interchange was intended to further the conspiracy in that it was meant to convey to a purchaser of the drugs that he should contact a new person (Galloway) for future drug deals because Boutte had lost favor with Cornett and Galloway had taken her place. The prosecution argued that this message is evidenced by the references to Galloway in connection with the drug money. In finding that the tape was admissible under Rule 801(d)(2)(e) the district court stated:

> The tape says that, essentially, Boutte feels like she's being compared to the woman who Cornett bought a Mercedes for. I hear the word "Mercedes" in there and then they say "who" and they say "Mary." And this was all in connection with the half-million dollars.

It is well-settled that a statement made among conspirators for the purpose of describing proper sources, avenues or conduits to promote the conspiracy is "in furtherance" for purposes of Rule 801(d)(2)(e). *See United States v. Lechuga*, 888 F.2d at 1480 (holding that during a conversation arranging a drug transaction, a reference to a "Wisconsin Source" as the source of the drugs in question was in furtherance of the conspiracy). However, in the cases in which a statement was found to be "in furtherance", either the statement itself or the conversation as a whole was intended to advance, facilitate or promote the ultimate conspiratorial

13

objective.  By way of contrast, conversations that represent "mere idle chatter" or which are mere narratives of past conduct are not in furtherance of the conspiracy because the statement and the conversation were not intended to further the conspiracy, regardless of whether an individual co-conspirator was implicated in the conversation.  *See Means*, 695 F.2d at 818; *see also United States v. Phillips*, 664 F.2d 971, 1027 (5th Cir. 1980) (abrogation on other grounds recognized by *United States v. Huntress*, 956 F.2d 1309 (5th Cir. 1992)).  The distinction between conversations in furtherance of the conspiracy and prejudicial statements made in conversations not in furtherance of the conspiracy has been recognized in other circuits as well.  *See, e.g.*, *United States v. Lieberman*, 637 F.2d 95, 102 (2nd Cir. 1980) ("The conversation . . . smacks of nothing more than casual conversation about past events.  It is difficult to envision how it would have furthered the conspiracy"); *United States v. Santos*, 20 F.3d 280, 286 (7th Cir. 1994) ("These statements are best described as narrative discussions of past events, which do not satisfy the 'in furtherance' requirement of Rule 801(d)(2)(E)"); *United States v. Roberts*, 14 F.3d 502, 514-515 (10th cir. 1993) ("mere narratives between co-conspirators or narrative declarations of past events are not in furtherance"); *United States v. Urbanik*, 801 F.2d 692, 698 (4th Cir. 1986) ("We think that this statement can fairly be treated only as the sort of idle conversation which though it

14

touches upon, does not 'further' a conspiracy").

In this respect, the present case is factually similar to the one addressed by the Fourth Circuit in *Urbanik*. In *Urbanik*, two co-conspirators conducted a conversation in furtherance of the conspiracy. Once they finished the business of the conspiracy, the two co-conspirators moved to a different part of the house and began lifting weights. During this weight lifting session one of the co-conspirators implicated a third co-conspirator. The Fourth Circuit held that this statement was inadmissible hearsay in that the statement was not in furtherance of the conspiracy. It was evident that the conversation was between two co-conspirators and that it was made during the course of the conspiracy in that they had just finished conducting the business of the conspiracy. However, it was also clear that the co-conspirators had ceased the operations of the conspiracy and had begun engaging in "mere idle chatter" as they pursued an unrelated activity. In the words of the Fourth Circuit:

> The statement identifying Urbanik as Pelino's "connection" for marijuana was merely a casual aside to the discussion of Urbanik the weight-lifter. In no sense but a most speculative one could it be thought to have been made to further the purposes of the conspiracy. Haselhuhn himself testified that this identification of Pelino's marijuana supplier could have had no effect on the conspiratorial relationship between him and Pelino. We think that this statement can fairly be treated only as the sort of idle conversation which though it touches upon, does not "further," a conspiracy, and which accordingly should not be admitted under Rule 801(d)(2)(E). *See United States v. Means*, 695 F.2d 811, 818 (5th Cir.1983); *United States v. Lieberman*, 637 F.2d 95, 102 (2nd Cir.1980); *United States v. Eubanks*, 591

15

F.2d 513, 520 (9th Cir.1979). The requirement that the statements have been in furtherance of the conspiracy is designed both to assure their reliability and to be consistent with the presumption that the coconspirator would have authorized them.... The requirement is not satisfied by a conversation ... which amounted to no more than idle chatter.

*Urbanik*, 801 F.2d at 698 (citations in original).

In the present case, the context of the admitted statements is that Boutte and the Informant were discussing a variety of subjects, which did not concern the conspiracy. The subject of whether Galloway enjoyed the confidence of Cornett arose out of a conversation about relationships and trust in relationships -- the conversation turning to the specific trouble in Boutte's relationship with Cornett. The reference to the half-million dollars and then to Mary cannot reasonably be construed to convey to the Informant the message that future business in the conspiracy was to be conducted through Galloway instead of Boutte. Rather, the reference to Galloway and $500,000 was "a mere casual aside" in the conversation about Boutte the spurned lover and Galloway the other woman. That an allusion to the half-million dollars and Galloway was made in the statement is irrelevant for purposes of Rule 801(d)(2)(e) because the possible connection was not made in furtherance of the conspiracy and the statement was not part of a conversation that itself was in furtherance of the conspiracy. While this may be the kind of conversation that touches upon the conspiracy, it cannot fairly be said that it furthered the conspiracy and thus its admissibility was not authorized by Rule

16

801(d)(2)(e).

This, however, is not the end of the analysis -- for errors in evidentiary rulings are subject to the doctrine of harmless error. *See* Fed.R.Crim.P. 52(a); *Phillips*, 664 F.2d at 1027. Under a harmless error analysis, the issue is "whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *See Walker*, 148 F.3d at 526 (citing *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)). The focus, therefore, is on the effect that an error may have had upon the verdict actually rendered. *Id*. Thus, the error will not require reversal if "beyond a reasonable doubt the error complained of did not contribute to the verdict obtained." *Sullivan*, 508 U.S. at 279.

Under this standard it cannot be said that the error in admitting Exhibit 1.165 was harmless. The evidence tending to show Galloway's guilt was not unequivocal. One witness testified that during a drug purchase he made on the street from Cornett, he might have seen Galloway standing in the doorway of the house from which Cornett had come. However, his testimony was impeached due to his long-term drug use and the fact the event occurred late at night and far from his view, and that he could not be certain whether the woman in the doorway was Galloway or Boutte. Another witness testified that, while chastising him for miscounting $21,000 as $18,000, Cornett told him that Galloway had counted more money than that accurately. However, the witness admitted that this testimony was a vague recollection about a statement Cornett made in passing.

17

A third witness testified that Galloway escorted him to the door of a room at her place of employment in which Cornett was counting over $400,000. However, there was no direct evidence that Galloway had seen the money or had knowledge of its source. The government also introduced evidence of Galloway receiving expensive gifts from Cornett and writing checks on her account, covered by Cornett's cash, to pay his creditors. Galloway, testifying on her own behalf, disputed all of this evidence -- contending that she had never counted money except on her previous jobs at a beauty salon and a bank, had never witnessed a drug purchase, and had not been present at the house in front of which the drug transaction described by the drug buyer witness had occurred. Other than Exhibit 1.165 and the government's representations of its contents, no additional evidence or information was presented by the government with respect to Galloway's participation in the conspiracy.

Upon motion for acquittal, the district court noted that the government had not developed a compelling case with respect to Galloway's participation in the conspiracy. Specifically, the district court stated:

> I have to tell you, I think it's a very, very thin case, but I don't think the arguments that you're making, though, to the judgment of acquittal, I think they go to the weight to which the evidence is entitled . . . but I will tell the Government how thin I think this case is as against Ms. Galloway. I'm not going to grant [the] motion at this time . . . but I will tell you, you all need to make a major argument at the end of the case.

18

The government heavily relied on the statements in Exhibit 1.165 and its representations of them to oppose Galloway's motions for acquittal and new trial before the district court. After the district court's admonishment, the parties proceeded to closing arguments. During closing, the government made the following statement, further representing the contents of Exhibit 1.165 to the jury and stressing the importance of this particular tape to the government's case against Galloway:

> For those of you who question, those of you who question, the involvement of Mary Galloway in this case, there are more than 100 tapes. There is no way, in reasonable fashion, you can play all those tapes for a jury. You have to be selective. <u>If you have some doubt as to Mary Galloway's involvement in this criminal conspiracy, you play -- its almost 50 minutes long, but you have to listen to it from beginning to the end to get it in full context. But if you listen to Government 1.165, 165 like 365 days in the year, 165 days in a year, 1.165, you will hear Kim Boutte and Reginald Sanders discussing her role. Over nearly -- well over $450,000 in cash had to be counted and they used her name in discussing the role.</u>

(emphasis added). Also, the government introduced a written summary description of Exhibit 1.165, which was presented to the jury, containing the following representation of the substance of the tape -- "Boutte advised that Mary stored ½ million dollars for Wendell Cornett and that Cornett purchased a Mercedes."

The government's evidence against Galloway was "thin" as the trial judge observed, because no item of evidence directly linked Galloway to the conspiracy. Further, the government relied heavily on the ambiguous audiotape Exhibit 1.165 to give meaning to all of its evidence concerning Galloway. But the tape is almost

19

unintelligible and the government's interpretation of the recorded conversation (both in its written summary of Exhibit 1.165 and in jury arguments) as containing a statement "in furtherance" of the conspiracy is not supported by our hearing of the tape or our reading of its written transcription. Consequently, it cannot fairly be said that the guilty verdict actually rendered against Galloway was surely unattributable to the erroneous admission of Exhibit 1.165 and the government's highly subjective interpretation of its contents. Accordingly, the error can not be characterized as harmless, and the admission of Exhibit 1.165 was reversible error.

IV.  CONCLUSION

For the reasons assigned, the convictions and sentences of Appellant Cornett are AFFIRMED, and the conviction and sentence of Appellant Galloway is REVERSED. Galloway's case is REMANDED to the district court for further proceedings consistent with this opinion.