**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James H. MEANS and Edgar C. Lloyd,
Jr., Defendants-Appellants.**

No. 81–4391.

United States Court of Appeals,
Fifth Circuit.

Jan. 3, 1983.

Earl Keyes, Jackson, Miss., for Rep. Means.

Samuel H. Wilkins, L.C. James, Jackson, Miss., for Rep. Lloyd.

James B. Tucker, Jerry A. Davis, Asst. U.S. Attys., Jackson, Miss., for plaintiff-appellee.

Before RUBIN, RANDALL and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

## I. INTRODUCTION

On July 20, 1981, after pleas of not guilty, Edgar C. Lloyd, Jr., and James H. Means were found guilty by a jury on three counts of mail fraud, fraud by wire, and aiding and abetting. The conduct with which the defendants were charged generally involved the use of their influence in obtaining banking charters from the State of Mississippi in exchange for money. During the time in question defendant Means was serving as Bank Comptroller for Mississippi. Lloyd was his friend and a former business associate.

Lloyd was sentenced on count 1, mail fraud, to 5 years, with 38 months suspended, leaving 22 months to serve, and a fine of

$1,000. On counts 2 and 3, he was given a suspended 5-year sentence and fined $1000 on each count. Means was given the identical sentence except that he was given a 44-month suspension on count 1, thus having to serve 16 months.

Despite the vigorous and forceful efforts by counsel for both defendants in this case, we cannot find that there was insufficient evidence to support the jury verdict nor do we find any reversible errors committed by the trial court. The judgment is therefore affirmed.

## II. FACTS

For purposes of clarity we will discuss separately the facts as they pertain to each defendant. In recounting the evidence below, we are required to take the view most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Bound by this standard there is certainly substantial testimony and other evidence, although disputed in several respects by the appellants, which supports the following version of the facts.

### A. Lloyd

In October 1974, the five-member State Banking Board conducted a 3-day hearing on the application for incorporation of Singing River Bank [hereinafter "SRB"] in Moss Point, Mississippi. The application had been pending since October 1973.

Evidence was presented to show that during the course of the hearing, Lloyd approached the SRB attorney who testified that Lloyd told him he was a friend of Means's and that he, Lloyd, would help get the charter. According to the SRB attorney, Lloyd said that, without his help, SRB would not get a charter. Lloyd indicated he would use his influence in exchange for $50,000-worth of stock in SRB with the understanding that the stock would be bought back within 2 years for $100,000.

The SRB attorney talked with bank officials and told Lloyd that they would accept his offer. The acceptance occurred during the October 1974 hearing.

Lloyd admitted that he had an agreement with the SRB attorney but denied representing that the charter would not be forthcoming without his help.

Subsequently, on October 24, 1974, Means signed the charter for SRB. SRB was still required to raise sufficient capital by selling their stock, after which the certificate to do business would be issued.

During this time period, the majority stockholders for First Mississippi Bank of Commerce [hereinafter "FMBC"] in Booneville, Mississippi, including the bank president, became concerned about their application for a branch office in Walnut, Mississippi, which had been pending since July 1974 in Means's office.[1] The delay was explained by Means to be the result of local opposition.

The FMBC president went to see Lloyd, believing that he could exert influence in such matters, and, after two meetings, raised $25,000 cash to be paid to Lloyd.

In early February 1975, a meeting was held at the Sheraton Motor Inn in Jackson, Mississippi. While those present were in the room, a call came in and the FMBC president said, "Ed is waiting." Although no one testified to having seen the $25,000 handed to Lloyd, he was seen on and about the premises, the money had been brought for him, and it did not go back with the men who brought it.

Part of the $25,000 was raised by a check from the FMBC president to "cash" for $5,000. The check was dated February 3, 1975.

On February 3, 1975, Means signed the FMBC application for the Walnut branch. Lloyd admitted talking to Means about the Walnut branch. He also admitted that the president had asked for his help but he denied any payoff.

During this time SRB was trying to sell stock in order to raise the necessary capital. Lloyd needed $50,000 to purchase the SRB

---

**1.** Means had statutory authority to approve branch offices with concurrence of the gover-nor or the attorney general. Miss.Code Ann. § 81–7–1 (1972).

stock. Although he was not a friend of the FMBC president or a customer with FMBC, Lloyd contacted the FMBC president who agreed to loan him the $50,000.

A vice president of FMBC was instructed to meet with Lloyd at the Jackson Sheraton where, on July 2, 1975, Lloyd filled out the loan papers and received a deposit slip for $50,000. The note was secured by the stock, which Lloyd told the vice president that day was worth $20-per share. However, Lloyd purchased 5,000 shares of SRB stock at $10-per share.

Although the loan occurred on July 2, 1975, it was not reflected on FMBC's books until August 4, 1975. On that date Means signed the certificate authorizing SRB to begin business as a bank.

At some point during 1976, Lloyd's $50,000 FMBC loan came due, and according to testimony, he began making demands on the SRB attorney for the $100,000 repurchase of SRB stock. The attorney could not raise the money, but did succeed in arranging a $60,000 loan for Lloyd, with the stock as collateral, from Southern National Bank in Birmingham, Alabama. SRB sponsored the loan. Lloyd was not a customer of either SRB or Southern National.

The count 1 essential mailing is the SRB letter to Southern National Bank requesting the loan and enclosing Lloyd's financial statement. The entire loan process was handled by mail and telephone.

Pending approval of the Southern National Bank loan, Lloyd demanded an immediate advance of $10,000 from the SRB attorney. On October 1, 1976, $10,000 was wired from SRB's account with correspondent Hancock Bank in Gulfport, Mississippi, to Lloyd's checking account in Jackson. That same day, a telephone conversation occurred between Southern National Bank and SRB indicating approval of the $60,000 Lloyd loan.

This telephone conversation constitutes the count 2 essential wire.

On October 8, 1976, Southern National Bank disbursed $60,000 to Lloyd. Of that amount, $50,000 went to FMBC as partial payment on the loan used to purchase the SRB stock. The remaining $10,000 went to Hancock Bank to pay off the advance.

On October 11, 1976, Lloyd paid Means $4,200. Means converted this to a cashier's check, which he cashed. Lloyd agrees that the $4,200 paid to Means came out of the $10,000 advance from SRB. Lloyd testified that this $4,200 was part of a real estate deal between Means and Lloyd.

The next day, on October 12, 1976, Means authorized the opening of SRB's Pascagoula branch.

A few months later, Lloyd renewed his demand for the $100,000 from SRB's attorney. This time the attorney got a co-stockholder at SRB to borrow $100,000 from Southern National Bank to buy Lloyd's stock. From the proceeds of that loan Southern National Bank was repaid $60,855.30, which canceled the Lloyd note.

The count 3 essential wire is the December 9, 1976, wiring of the payment of the $60,000 Lloyd note from the correspondent Hancock Bank to Southern National Bank.

The SRB attorney received the remaining $39,144.70, which he converted to a cashier's check, payable to Lloyd, for $39,126.80.[2]

On December 9, 1976, the SRB attorney delivered the cashier's check to Lloyd. Evidence was presented to show that the next afternoon, after 5:15 p.m., Means called the president of Fidelity Bank in Jackson, requesting a favor and saying that he needed some cashier's checks. Means and Lloyd went into the bank. Means had the check payable to Lloyd for $39,126.80. Means had the check broken down into several smaller checks. According to the evidence introduced by the government at trial, there was essentially an even-split of the check.[3]

---

**2.** The difference between the two amounts is the exchange fee charged by Deposit Guaranty National Bank in Jackson, Mississippi, for conversion of the wire to the cashier's check.

**3.** Several weeks later Lloyd paid off the interest on the FMBC $50,000 note with proceeds from the cashier's check, finally canceling the FMBC debt.

Lloyd's position regarding the payment to Means was that this was part of an $18,000 loan to Means.

### B. Means

James H. Means served as Bank Comptroller for the State of Mississippi during the relevant time period. He supervised the State Department of Banking which had responsibility for all banking activities in the state, including bank charters for new banks and permits for branch banks.

At some point during the October 8–10, 1974, hearing on the SRB charter, Lloyd contacted the SRB attorney and said that "he was friends with the comptroller and he [Lloyd] could get us this charter." The financial arrangement discussed above was agreed to, and on October 24, 1974, one year after its filing, the SRB charter application was granted by Means.

During this period, according to testimony, FMBC made its deal with Lloyd, with the $25,000 payment being brought on or about February 3, 1975, to the Sheraton Motor Inn in Jackson. There was testimony that, at one point, Means came into the room where three of the FMBC bankers were waiting, although not at the same time that Lloyd was there. Although no one claims to know what happened to the money, the men who brought it did not take it back to Booneville with them.

Means signed the FMBC branch permit on February 3, 1975. The permit had been pending since July 1974. Lloyd discussed the branch application with Means. Means stated that the reason for the delay was that there was local opposition to the branch.

On August 4, 1975, Means signed the certificate allowing SRB to begin doing business as a bank. On that day, FMBC entered the loan on its books to Lloyd of the ᐧ $50,000 used for purchase of the SRB stock. The loan occurred on July 2, 1975.

Means received $4,200 from Lloyd out of the $10,000 which had been wired from SRB's Hancock account. This $4,200 payment occurred on October 11, 1976. On October 12, 1976, Means authorized SRB's Pascagoula branch.

Late one Friday afternoon, on December 10, 1976, Means contacted the president of Fidelity Bank in Jackson and requested a favor, saying he needed some cashier's checks. He and Lloyd walked across the street to the bank and split the $39,126.80 cashier's check from the SRB attorney.[4]

## III. ISSUES AND DISCUSSION

### A. Sufficiency of the Evidence

Both Lloyd and Means argue that the district court erred in denying the Motion for a New Trial and for Judgment of Acquittal.

█ According to both defendants the government failed to prove the necessary elements to substantiate its case. Under *United States v. Goss*, 650 F.2d 1336, 1341 (5th Cir.1981), and *United States v. Zicree*, 605 F.2d 1381 (5th Cir.1979), *cert. denied*, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980), the necessary elements of proof in mail and interstate communication fraud cases are that a scheme to defraud existed and that the mail or interstate communication, such as wire or telephone, was used for the purpose of executing the scheme.

█ The defendants argue that the government failed to prove beyond a reasonable doubt that a scheme to defraud existed between Lloyd and Means. They assert this argument with regard to both FMBC and SRB. Both defendants point out that the principal evidence presented as to SRB came from the SRB attorney, whom they characterize as "an admitted perjurer."[5]

---

4. One of the key items of evidence introduced at trial was Government Exhibit 39, which is a chart summarizing the division of the cashier's check between Means and Lloyd. Its admissibility has been objected to and is discussed at note 6 *infra*.

The exhibit is reproduced at the end of the opinion as the Appendix.

5. The SRB attorney admitted during the trial that he had appeared before a Grand Jury twice in this case, on separate occasions. On the second such occasion, under threat of in-

We find that, despite the strenuous arguments as to the "circumstantial" nature of the government's case, and despite the doubts cast on the veracity of the SRB attorney, ample evidence existed upon which the jury could base its verdict. Circumstantial evidence of sufficient weight can support a jury's inference of a scheme such as this. *United States v. Goss,* 650 F.2d at 1343. And even were we to discount the SRB attorney's testimony, a multitude of other witnesses presented damning evidence of an "influence-for-pay" scheme. The inferences drawn by the jury from the facts were supported by substantial evidence.

Testimony and exhibits introduced at trial supported the following crucial determinations:

Lloyd told the SRB attorney that for $50,000 payable in 2 years, he could get the charter approved. The SRB attorney agreed to the deal and the application was approved within 2 weeks;

Lloyd told the FMBC president that for $25,000, he could get the branch application approved. On or about the day the $25,000 intended for Lloyd "disappeared" at the Jackson Sheraton, Means approved the FMBC branch;

The day after Lloyd paid Means $4,200 out of the $10,000 received from SRB, Means approved the SRB branch application;

The day after the SRB attorney paid off the remaining $40,000 to Lloyd, Lloyd and Means "divied" up the check in a method designed to launder the money.

As the government attorney stated in oral argument before the court, the splitting up of the cashier's check by Means and Lloyd, which they admit, constitutes the linchpin of the government's case. Without this "smoking gun" the evidence might well have fallen short of meeting the required burden. Means himself stated that, but for the ill-fated walk across Hamilton Street, late on a Friday December afternoon, he could not have been connected with the disbursement of the check. Means and

Lloyd contend that this was another loan. Means testified that it was part of an $18,-000 loan to pay off "pressing" obligations. The evidence produced to substantiate this contention failed to persuade the jury.

Means earnestly argues that the timing of all these damning simultaneous occurrences is mere coincidence and that he has been convicted for doing no more than performing his official duties. The jury was unpersuaded that mere chance was involved in the coincidence between the apparent quids and quos. Means's attorney presented a well-prepared case with elaborate documentation regarding the timing of the permits and the charter. The jury could have believed that version of the events. They chose not to.

To repeat, under *Glasser* we find that the trial court did not err in denying the defendants' motions. Sufficient evidence was presented to support an inference by the jury of a scheme by Lloyd and Means to swap their influence for money.

### B. Statute of Limitations

█ Both defendants argue that the district court erred in admitting evidence regarding the FMBC branch office application since the "payoff" was concluded in February 1975, more than 5 years before the August 22, 1980, indictment, and was therefore outside the statute of limitations under 18 U.S.C. § 3282.

The statute of limitations is not implicated insofar as the admissibility of evidence regarding FMBC is concerned. The substantive charges in the indictment concern only the use of the interstate mails and wires to effectuate payment for the SRB stock and repayment of the loans. The statute of limitations has no bearing on the time of occurrence of the evidence which supports these specified charges.

The only issue with regard to the admissibility of the FMBC portion of the evidence is whether it was relevant to prove the charges included in the indictment.

dictment, he recanted significantly the testimony which he had previously given.

We find that, in that context, the evidence as to the FMBC fraud was clearly admissible under Fed.R.Evid. 404(b) to establish proof of motive, intent or a common plan. *See United States v. Wasler,* 670 F.2d 539, 542 (5th Cir.1982); *U.S. v. Yaughn,* 493 F.2d 441, 443 (5th Cir.1974). As was held in *U.S. v. Killian,* 639 F.2d 206, 211 (5th Cir.), *cert. denied,* 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981), where the evidence of the two occurrences is "inextricably intertwined," and where the "extrinsic" evidence establishes motive and intent, it is admissible.

The government showed that, in all likelihood, but for the Lloyd-Means assistance to FMBC in granting the branch permit, the FMBC loan to purchase the SRB stock would not have been made. Lloyd was not a customer of FMBC's or a personal friend of the FMBC president. The FMBC vice president who actually made the loan testified that he would not have made such a loan except for the president's instructions to do so. The loan thus made by FMBC was an essential part of executing the SRB scheme.

The evidence presented by the government consisted of a tightly-woven fabric, "inextricably intertwined," involving both banks.

### C. Introduction of the Government's Chart

■ Both defendants argue that the introduction of the chart showing the breakdown of the $39,126.80 check between them was in error and is reversible.[6] Specifically, they object to the government's assertion that the $8,000 difference in Lloyd's favor can be interpreted as payment by Means of one-half of the interest on the FMBC note. They argue that there was no evidence of this introduced at trial and that it was therefore improperly admitted.

■ The trial court has discretion to determine whether illustrative charts may be used pursuant to Fed.R.Evid. 1006. *United States v. Smyth,* 556 F.2d 1179, 1184 (5th Cir.1977); *Baines v. U.S.,* 426 F.2d 833, 840 (5th Cir.1970); *Lloyd v. United States,* 226 F.2d 9, 16 (5th Cir.1955). Unless that discretion is abused, we will not reverse the court's decision.

Unarguably, the government did make assumptions, reflected on the chart, as to the defendants' motives in their division of proceeds. Such assumptions are permissible so long as supporting evidence has been presented previously to the jury, *United States v. Diez,* 515 F.2d 892, 905 (5th Cir. 1975), and where the court has "made it clear that the ultimate decision should be made by the jury as to what weight should be given to the evidence." *United States v. Andrew,* 606 F.2d 549, 550 (5th Cir.1979).

Here defendants' attorneys conducted a thorough cross-examination of the witness responsible for preparing the chart and had an opportunity to demonstrate to the jury that the assumptions made from the chart were no more than mere assumptions. While we recognize the powerful impression which charts can make upon a jury, vesting the charts with "an air of credibility" independent of the evidence purported to be summarized, *Steele v. United States,* 222 F.2d 628, 630 (5th Cir.1955), the previously introduced evidence underlying the chart here was sufficient to support the government witness's testimony and the chart. The witness's conclusion constituted a fair assumption based on all the evidence, was subject to full cross-examination by defendants' attorneys, and the jury was instructed amply to give it only its due weight.[7]

### D. FMBC President's Statement

■ Lloyd contends that the trial judge committed reversible error in allowing a government witness to testify to a statement made to him by the FMBC president prior to the meeting at the Sheraton Motor Inn.

---

**6.** *See* note 4 *supra.*

**7.** *See generally United States v. Smyth,* 556 F.2d at 1182–84 (discussion of admission of charts and summaries of evidence).

The witness stated that when he was driving the president from the Jackson Airport to the Sheraton Motor Inn, the president mentioned that the meeting concerned the application for the branch and that it was going to cost $25,000. He mentioned Lloyd by name, saying that he was "going to talk to some people with influence to where they could get the charter."

■ The trial court admitted the testimony under the coconspirator non-hearsay rule, Fed.R.Evid. 801(d)(2)(E). Under our holding in *United States v. James,* 590 F.2d 575, 582 (5th Cir.1979), conspiratorial declarations are admissible when it has been "shown by a preponderance of the evidence independent of the statement itself (1) that a conspiracy existed, (2) that the coconspirator and the defendant against whom the coconspirator's statement is offered were members of the conspiracy and (3) that the statement was made during the course and in furtherance of the conspiracy."

We think the statement should have been excluded. Aside from the question of whether the FMBC president qualifies as a "coconspirator," nothing exists in the record to indicate that he somehow intended to further the scheme by announcing it to the witness. This was "mere idle conversation," was not in furtherance of the conspiracy, and should not have been admitted under the hearsay exception. *United States v. Phillips,* 664 F.2d 971, 1027 (5th Cir.1981).

Reading the record as a whole, however, it is apparent that the testimony was merely cumulative. Numerous witnesses testified as to the meeting, and the error was harmless. *Id.*

### E. Motion to Sever

■ Prior to trial, Means moved to sever his case from Lloyd's. This motion was denied, with the instruction that Means should re-raise the motion during trial, if prejudice occurred. Means did not do so.

Means now argues that his motion should have been granted on the basis of complexity and confusion. He contends that the evidence was primarily concerned with Lloyd and that the jury was confused by the complex fact situation, to Means's prejudice. While this circuit does not recognize waiver of severance upon non-renewal of the motion at trial, we do require a showing of "compelling prejudice" resulting from the denial of the motion. *United States v. Staller,* 616 F.2d 1284, 1294 (5th Cir.), *cert. denied,* 449 U.S. 869, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980).

■ The mere fact that the fact-situation is complex does not compel severance; indeed, we have held that it might mitigate against severance in that separate trials would drain our judicial resources. *United States v. Diez,* 515 F.2d at 904. The test for severance, which has become virtual black-letter law, was set forth in *United States v. Kahaner,* 203 F.Supp. 78, 81–82 (S.D.N.Y.1962):

> [W]hether, under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted.

(Citations omitted.)

We think the jury could understand sufficiently the evidence presented as to Means, separate from that presented as to Lloyd. This was a long trial and numerous steps in the evidentiary process were necessary, but insofar as Means is concerned the evidence was clear and, in many instances, discrete from that which concerned Lloyd.

### IV. CONCLUSION

The defendants raise several other arguments concerning the conduct of the trial

which have been carefully considered. We cannot find any reversible error committed below. Essentially, the defendants were tried by a jury of their peers, with representation by able counsel, before a judge mindful of their due process rights. The court was careful at all times to safeguard those rights, especially in his instructions to the jury.

We therefore affirm the trial court's ruling and its judgment and probation/commitment order.

AFFIRMED.

## APPENDIX

G–39

### FROM SALE OF
### SINGING RIVER BANK STOCK

Cashiers check          $39,126.80

December 10, 1976

|  | Means |  | Lloyd |  |  |
|---|---|---|---|---|---|
|  | Cashiers check | $6,168.00 | Cashiers check | $10,000.00 |  |
| (G–30–31) | Cashiers check | 4,227.40 | Cashiers check | 8,000.00 | (G–32) |
|  | Cashiers check | 3,084.00 | Cashiers check | 5,000.00 |  |
|  | Cashiers check | 2,084.00 | Cash | 563.40 |  |
|  |  | $15,563.40 |  | $23,563.40 |  |

$23,563.40
+ 15,563.40
**$39,126.80**

$23,563.40
− 15,563.40
**$ .8,000.00**

December 13, 1976

$8,000 deposit to Lloyd's FNB Special Account      (G–33)

December 30, 1976

$7,925.35 check from Lloyd's Special Account to pay balance of FMBC note to purchase SRB stock      (G–34)

$7,925.35 divided by 2 = $3,962.68
($8,000 divided by 2 = $4,000)

| Means | Lloyd |
|---|---|
| $15,963.40 | $23,563.40 |
| + 3,962.68 (4,000) | − 8,000.00 |
| **$19,526.08** ($19,563.40) | $15,563.40 |
|  | + 3,962.68 (4,000) |
|  | **$19,526.08** (19,563.40) |

Excess to Lloyd $74.65