**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 01-60304
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RODALTON HART

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Mississippi (Jackson Division)

_____

June 12, 2002

Before KING, Chief Judge, and REAVLEY and WIENER Circuit Judges.

WIENER, Circuit Judge:

Defendant-Appellant Rodalton Hart ("Rodalton") appeals his conviction by a jury for violations of 18 U.S.C. § 1014 ("§ 1014") and 18 U.S.C. § 201(b)(1)(B) ("§ 201(b)(1)(B)"). We conclude that the United States's ("the government's") "summary" witness did far more than summarize previously-presented evidence, and that, when the summary witness's testimony and accompanying documentary evidence is redacted, the remaining evidence is insufficient to prove the government's case against Rodalton beyond a reasonable doubt. We therefore reverse Rodalton's conviction, vacate his sentence, and remand the case for a new trial.

I. Facts and Proceedings

Rodalton has been a resident and family farmer in Holmes County, Mississippi for most of his life. After his graduation from Jacksonville State University in 1972, he returned to Holmes County to help his father run the family farm. In addition to helping his father, Rodalton started his own farm, gradually expanding his operation from thirteen acres —— cultivating row crops and raising cattle —— to several thousand acres by the mid-1980s. His success in farming was among the factors that led Mike Espy, who was Secretary of Agriculture at the time, to appoint Rodalton as one of Espy's advisors.

In 1993, Rodalton and his brothers, who were also involved in farming, formed five separate partnerships, hoping to run their farming operations more efficiently by sharing labor, land, and equipment, and thereby maximize their income. Among the partnerships were R & C Farms (Rodalton and his wife, Carmella), and C & D Farms (Cleveland Hart and Chester Hart, with Cleveland and Rodalton serving as the local business contacts for the partnership). Another Hart brother, Larry, farmed individually, but he and Rodalton served together as the business contacts for Larry Hart's farming operation.

After weather-related problems in 1993 and 1995, Rodalton and Carmella were declared eligible for federal disaster relief and an emergency loan. Rodalton applied to the United States Department of Agriculture, Farm Service Agency ("FSA" or "the Agency") for

2

such assistance,[1] but the application was denied. When he looked into this matter, Rodalton discovered that his FSA file had been transferred to the office of the Inspector General of the Department of Agriculture, in connection with that office's investigation of Secretary Espy. Without the file, the FSA could not process Hart's application. Rodalton traveled to Washington, D.C. to meet with federal officials, congressmen, and Senate staff members in an effort to have his loan processed, but by the time anything could be done to remedy the situation, the 1996 crop year had passed.

Without the 1996 loans, the Hart brothers' partnerships needed financial assistance in 1997 and 1998. Accordingly, they submitted applications to the FSA in both years, including disclosure to the FSA of the partnerships' debts, liabilities, and projections of income, operations, and expenses. For the applications in question, the process of disclosing and assessing the financial

---

[1] The Agency has the responsibility for collecting, servicing, and liquidating all loans made or insured by the Agency under the various farm loan programs of the Department of Agriculture. 7 C.F.R. § 2.42(a)(29). Under the federal farm loan assistance programs administered by the Agency, a farmer may apply for various assistance, including operating loans and emergency loans. "The basic objective of the [operating loans] program is to provide credit and management assistance to farmers and ranchers to become operators of family-sized farms or continue such operations when credit is not available elsewhere." 7 C.F.R. § 1941.2. This financial assistance "enables family-farm operators to use their land, labor and other resources and to improve their living and financial conditions so that they can obtain credit elsewhere." Id. Emergency loans, on the other hand, are designed to provide disaster relief assistance to farmer. See, e.g., 7 C.F.R. §§ 1945.154, 1945.162.

data required several months of work between the Harts and the local FSA agent who worked closely with them, Orlando Kilcrease. Rodalton signed the applications on behalf of R & C Farms, C & D Farms, and Larry Hart, certifying the following:

> The above information is furnished for the sole purpose of securing and maintaining credits [sic] and is certified to be complete and correct. The undersigned authorizes the FmHA to make all inquiries deemed necessary to verify the accuracy of the information contained above to determine my [creditworthiness] and to answer questions about their credit experience with me. I agree to notify FmHA promptly to [sic] any material changes to the above. I recognize that making any false statement on this Farm and Home Plan or any other loan document may constitute a violation of criminal law.

From the information disclosed, Kilcrease finally created a "Farm and Home Plan" ("FHP") for each of the various partnerships. A FHP is a computer generated "projection that accurately reflects the borrower's plan of operation for the production or marketing cycle."[2] Its essential purpose is to demonstrate that the farmer applying for the loan expects a positive cash flow for the projected crop year.[3] Rodalton and his brothers signed the FHPs that Kilcrease had created, certifying the following:

> I agree to follow this plan and to discuss with the County Supervisor any important changes that may become necessary. This is a prospective plan and does not release the security interest of the government in any security referred to in this plan. "I

---

[2] 7 C.F.R. § 1924.54.

[3] 7 C.F.R. § 1924.56.

4

recognize that making any false statement on this Famr [sic] and Home Plan or any other loan document may constitute a violation of federal criminal law[.]"

After the 1997 and 1998 FHPs had been submitted, the government began to investigate the Hart brothers' farming operations. Rodalton contends that the government commenced this investigation as retaliation for his "failure to provide any useful information to the government in its investigation of Mike Espy." Whatever the government's incentive might have been, the investigation into the Hart brothers' farming operations culminated in a 1999 grand jury indictment, in which Rodalton and two of his brothers, Cleveland and Larry, were charged with engaging in a conspiracy to defraud the government and making false statements to the government in the 1997 and 1998 FHPs. The indictment also charged Cleveland Hart with disposing of property that had been pledged to the FSA, and charged Rodalton with bribing an FSA official.[4]

After a two-week trial, a jury found the three brothers not guilty of the conspiracy charge, and also found Larry and Cleveland Hart not guilty of all other charges against them. The jury found Rodalton guilty, however, of knowingly making material false

---

[4] The indictment also charged Harrell Neal, an FSA agricultural manager specialist, with accepting bribes in return for being influenced to commit fraud on the United States. Neal entered into a plea agreement, however, in which he agreed to plead guilty and testify for the government in its prosecution of the Hart brothers in exchange for the prosecutor's recommendation to the court that Neal receive a reduced sentence.

statements to the FSA in 1997 and 1998 for the purpose of influencing the grant of loans, in violation of § 1014; and of corruptly giving $1,000 to a public official (Neal) with the intent to influence the official to commit fraud on the United States — in the form of approving operating loans to the Hart brothers' partnerships — in violation of § 201(b)(1)(B). Rodalton timely appealed his conviction and sentence.

## II. Analysis

A. <u>Standard of Review</u>

> The trial court has discretion to determine whether illustrative charts may be used pursuant to Fed.R. Evid. 1006. <u>United States v. Smyth</u>, 556 F.2d 1179, 1184 (5th Cir. 1977); <u>Baines v. U.S.</u>, 426 F.2d 833, 840 (5th Cir. 1970); <u>Lloyd v. United States</u>, 226 F.2d 9, 16 (5th Cir. 1955). Unless that discretion is abused, we will not reverse the court's decision.[5]

If the court errs in its evidentiary ruling, the "error can be excused if it was harmless."[6] In applying this rule, we have stated:

> A nonconstitutional trial error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict." [<u>Lowery</u>, 135 F.3d at 959] (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)); <u>see</u> <u>United States v. Sanchez-Sotelo</u>, 8 F.3d 202, 210 (5th Cir. 1993) (stating that in order to reverse a conviction on the basis of an evidentiary error, the appellate court

---

[5] <u>United States v. Means</u>, 695 F.2d 811, 817 (5th Cir. 1983).

[6] <u>United States v. Polasek</u>, 162 F.3d 878, 886 (5th Cir. 1998) (citing <u>United States v. Lowery</u>, 135 F.3d 957, 959 (5th Cir. 1998)).

must find a "significant possibility that the testimony had a substantial impact on the jury") (quoting <u>United States v. Cain</u>, 587 F.2d 678, 682 (5th Cir. 1979)).[7]

B. <u>Discussion</u>

Rodalton contends that the district court abused its discretion when it allowed a government witness, Shelly Davis, to testify as a summary witness pursuant to Federal Rule of Evidence 1006 ("FRE 1006"), and to present, as a "summary," some FHPs that she had prepared. We agree with Hart, and therefore reverse the judgment against him.

FRE 1006 provides:

> **Rule 1006. Summaries**
>
> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

Recognizing the "powerful impression which charts can make upon a jury, vesting the charts with 'an air of credibility' independent of the evidence purported to be summarized,"[8] we have repeatedly cautioned that trial judges "must carefully handle their

---

[7] <u>Id.</u> (parallel citations and punctuation parentheticals omitted).

[8] <u>Means</u>, 695 F.2d at 817 (citing <u>Steele v. United States</u>, 222 F.2d 628, 630 (5th Cir. 1955)).

preparation and use."[9]  Not only must such "writings, recordings, or photographs" be so "voluminous" that they "cannot [be] conveniently examined in court," as the Rule specifies, but there must be "supporting evidence [that] has been presented previously to the jury" to establish any assumptions reflected in the summary.[10]

In its case against the Harts, the government presented Davis, an employee of the FSA, to introduce revised FHPs that she had prepared, and to offer testimony about the revised Plans. According to the government, Davis's revised FHPs did nothing more than illustrate what the result would have been if all of the debts testified to by the government's witnesses had been included on the Harts' actual FHPs.

Hart objected to the government's strategy from the outset, pointing out that the government had failed to designate Davis (or anyone else) as an expert witness, and that the government was attempting to prove essential elements of its case against him through the improper use of FRE 1006.  In particular, Hart complained that the government had only presented evidence through its previous witnesses to show the Hart brothers' liability for

---

[9] United States v. Jennings, 724 F.2d 436, 441 (5th Cir. 1984) (citing Myers v. United States, 356 F.2d 469, 470 (5th Cir.), cert. denied, 384 U.S. 952 (1966)).

[10] Jennings, 724 F.2d at 442 (citing United states v. Means, 695 F.2d 811, 817 (5th Cir. 1983) (citing United States v. Diez, 515 F.2d 892, 905 (5th Cir. 1975), cert. denied, 423 U.S. 1052 (1976))).

debts that were not included on the original FHPs.  As Rodalton

argues in his appellate brief,

> Prior to the testimony of Shelly Davis, the government failed to present any evidence whatsoever that the debts Ms. Davis included in her five separate summaries (which were five Farm and Home Plan forms) <u>should actually have been reported in the categories she selected</u>, <u>should even have been reported in the five Farm and Home Plans at all</u>, or <u>even the proper amounts of such debts that should or should not have been reported on the Farm and Home Plans.</u> [Emphasis added.]

Rodalton advanced this argument prior to Davis's testimony, in an

<u>in camera</u> conference, as well:

> The government has to put proof in.  Your Honor, if I may just go through the trial at this point.  They've called witnesses to say, "I did the Farm and Home Plan.  This is the Farm and Home Plan."  One witness says, "I did something wrong."  Then they've called witnesses to put in debts that they say that they owed.
> <u>They have not called any witnesses to establish that those debts are debts that should have been put on the Farm and Home Plan.  They have not established the underlying proof that that is the case.</u>
> ... They have not established that — we can show debts out the kazoo.  The issue is should they be on the Farm and Home Plan. They have not established that.
> <u>If they had established that a debt should be on a Farm and Home Plan, allowed that testimony through a witness to which we could cross-examine [sic], then, your Honor, a summary witness to put it on a Farm and Home Plan or to do whatever, I wouldn't object</u>.  But they have not — they have not — <u>if they want to summarize all the debts they put in on a chart, that's fine; but they're going beyond that, your Honor.</u>
> <u>They have not established that these are debts that should have been reported on a Farm and Home Plan through any witness</u>, through the witnesses who did the Farm and Home Plan, through the FSA officers who worked there,

> through expert testimony as in the <u>Tannehill</u> case.
>
> ...
>
> By not requiring them to prove that the debts themselves are debts that should be reported, allowing them to simply call a witness to put them into a category without knowledge, without —— and not an expert prejudices us, and <u>it goes beyond a summary witness</u>, your Honor.
>
> This is —— <u>what they're trying to prove</u> through these summary charts <u>is this is where they belong</u> without offering any proof that they belong there.

Our meticulous review of the record convinces us that there is merit to Rodalton's contentions on the issue of improper use of the purported summary witness. Reading Davis's testimony under direct and cross examination, it becomes abundantly clear that the proper preparation of a FHP is anything but a simple and straightforward exercise. Surveying the government's case as a whole, moreover, the total absence of any independent testimony to support Davis's assumptions in preparing the FHPs becomes palpable. In short, it is apparent to us that Davis functioned as the government's sole expert witness regarding the proper preparation of (1) FHPs generally, and (2) the Hart brothers' FHPs in particular, thereby unquestionably exceeding the scope of FRE 1006.

Davis's testimony reveals the extreme complexity of the FHP preparation process. With respect to plan preparation, there were two separate sources of confusion with which the jury had to grapple, and for which the jury was forced to rely solely on Davis's "summary" presentation to resolve. The first was the somewhat mechanical issue of determining what debts, and what

percentage of those debts, should be included on the FHP according to the relevant regulations.

The second source of potential jury confusion derived from the fact that the Harts' original FHPs were drawn up by local county FSA agents with the objective of assisting farmers, based not only on all of the submitted paperwork, but on the particular local agents' day-to-day interactions with the Harts and their creditors, and "real time" judgment calls. In stark contrast, Davis's "summary" FHPs were created specifically in preparation for government's prosecution of the Harts, relying solely on the contents of the paper files which she construed in a light most favorable to the prosecution and thus least favorable to the Harts. This latter source of confusion would have been acceptable (being a fact-specific question of bias and credibility, which the jury is well equipped to address), had the government properly eliminated the first —— educating the jury about the mechanics of preparing FHPs under the relevant regulations —— through independent proof prior to Davis's testimony, as required by FRE 1006. This the government failed to do, and therein lies the genesis of reversible error in this case.

The government insists repeatedly in its appellate brief that the FSA agent who originally prepared the Hart brothers' FHPs testified that "all debts" of an applicant belong on such a plan. Therefore, argues the government, Davis's inclusion of all of the debts testified to by the government's witnesses was based on an

assumption that was proved prior to the presentation of her "summary." We disagree. The blanket statement that "all debts" must be included on the FHP was a woefully inadequate guideline for answering the particular questions that confronted the jury concerning the proper preparation of a FHP. Instead, the jurors were forced to rely solely on Davis's interpretation of the scope of "all debts" and on her proffered expertise in drawing up FHPs when the jury was deliberating about myriad bewildering problems, including, without limitation: (1) If four brothers in partnership relation to one another are liable for a debt, the annual debt service payment on which totals $27,000, must each brother include the full $27,000 on his FHP in a column headed, "Amount Due This Year"?; (2) Should current crop year expenses incurred before signing a FHP into effect in July (i.e., in the middle of the crop year) be recorded as a projected crop-year expense, a current operating expense, or a current farm liability?; and (3) If a FHP lists a credit card bill in the farmer's wife's name, and the farmer's list of "living expenses" accounts for his expenses and those of his family, is it proper also to include the non-farm income of the farmer's wife? We are constrained to explain that these few examples scarcely convey the overarching and pervasive confusion and complexity that emanate from those extensive portions of the trial transcript touching on questions of proper FHP preparation.

The point we make is not whether Davis's interpretation and

application of the regulations were correct or whether her reconstructed FHPs for the Harts were correctly prepared. Rather, our point is to address the core problem of the government's failure to adduce any evidence —— to lay the necessary predicate prior to Davis's presentation of the "summary" FHPs —— in support of the many assumptions and conclusions that Davis drew when preparing her versions of the "proper" FHPs. Under the guise of a "summary" presentation, the government introduced its sole witness who could explain to the jury the proper preparation of FHPs. Even the district court appears to have developed a reliance on Davis's interpretation as the trial wore on. Prior to her testimony, in the same <u>in camera</u> conference from which Hart's argument is above excerpted, the district court correctly observed,

> Here I am concerned about the issue that is raised that, apparently, she would testify that this is the proper way to prepare this Farm and Home Plan from these. And I don't know that that's a summary witness. That sounds more like an expert witness.
> ...
> It does bother me —— and this is related to a discussion we had earlier in an argument that Mr. Sweet just made that we don't know whether this information is material. We don't know what a proper way to put together a Farm and Home Plan is. We don't know —— do we?
> ...
> ... I know you've got a materiality issue that court [sic] has reached, but it seems to me that the government has got to prove at least where these items ought to be put on the form.

Yet, by the time the government conducted its redirect examination of Davis, even the court exhibited an acceptance and dependence on her interpretation for its comprehension of the relevant

13

regulations and procedures:

> Q. [By government]  Which debts —— well, let me ask it this way: How many debts of a borrower should be listed on the Farm and Home Plan?
>
> A. [Davis]  All of the farm as well as nonfarm debt should be listed on the Farm and Home Plan.
>
> Q.  Let me hand you ——
>
> > MR. SWEET [for Rodalton Hart]: To which we object, your Honor, beyond the —— may we —— may I approach one moment, your Honor?
> >
> > THE COURT: Yes, sir.
> >
> > (BENCH CONFERENCE)
> >
> > MR. SWEET:  Your Honor, that's a whole new different regulation, a whole new different area that all debts go on a Farm and Home Plan.  They don't. He's just asking her. She's not stating a basis for it, no basis for it, just is she says it. [sic]
> >       There are specific regulations and that's —— this is not correct.  And I didn't go in and say all debts.  We went to the debts she claimed.  Some debts went back.  But that is a whole new area, your Honor, that there's a —— as to what debts go on the plan, there's a specific regulation.
> >
> > THE COURT:  If all debts go on it according to her, all debts go on it.  Overruled.
> >
> > (BENCH CONFERENCE CONCLUDED)

If an experienced Chief Judge of a district court comprising vast rural areas of an agrarian state, fully aware of the potential dangers of allowing summary evidence to do more than summarize, could lapse into such reliance on Davis's interpretation of these byzantine rules and arcane regulations, can there be any question that the jury's reliance on her testimony must have been absolute?

14

We think not.

As noted at the outset, we have made it quite clear that proper use of FRE 1006 requires that there be "<u>supporting evidence</u> [that] has been <u>presented previously</u> to the jury" to establish any assumptions reflected in the summary.[11]  The government failed utterly to meet this requirement.  Instead, it devoted most of its energy to showing the existence of debts that it maintains were undisclosed, without presenting any evidence to support the simple proposition that the <u>full</u> <u>amount</u> of those debts shown <u>belonged</u> on a <u>properly</u> <u>prepared</u> FHP.  The government easily could have designated an expert witness for this purpose, but elected not to do so.  In an apparent effort to make up for its omission, the government attempted to prove this crucial missing element through the admission of a "summary" chart.  But we have stated before, and emphasize here again:  The government <u>cannot</u> use a "summary" chart under FRE 1006 "to assume that which it was required to prove beyond a reasonable doubt as operative facts of the alleged offense."[12]  Yet that is precisely what the government tried to do here, through the documentary introduction of Davis's revised FHPs and the presentation of her accompanying explanatory testimony.

---

[11] <u>Jennings</u>, 724 F.2d at 442 (citing <u>United states v. Means</u>, 695 F.2d 811, 817 (5th Cir. 1983) (citing <u>United States v. Diez</u>, 515 F.2d 892, 905 (5th Cir. 1975), <u>cert.</u> <u>denied</u>, 423 U.S. 1052 (1976))) (emphasis added).

[12] <u>United States v. Taylor</u>, 210 F.3d 311, 316 (5th Cir. 2000) (citing <u>Baines v. United States</u>, 426 F.2d 833, 840 (5th Cir. 1070)).

15

Because, over vigorous objection, Davis was allowed to do far more than summarize previously presented evidence, we are left with no choice but to conclude that the district court abused its discretion in allowing her testimony and her reconstructed FHPs into evidence under FRE 1006.

Furthermore, there can be no question that this abuse of discretion "had substantial and injurious effect or influence in determining the jury's verdict."[13] Mindful as we are of the complete reliance that the jury must have had on Davis's "summary" evidence, there is far more than a "significant possibility that the testimony had a substantial impact on the jury".[14] We are convinced, in fact, that, absent Davis's testimony and accompanying documents, the government failed to prove a critical element of its case against Rodalton beyond a reasonable doubt, and that Rodalton's substantial rights were affected by the admission of Davis's revised FHPs and her explanatory testimony.[15] The district court's decision to allow Davis's testimony and "summary" FHP therefore constitutes reversible error, not merely harmless nonconstitutional trial error.[16]

---

[13] United States v. Lowery, 135 F.3d 957, 959 (5th Cir. 1998) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

[14] United States v. Sanchez-Sotelo, 8 F.3d 202, 210 (5th Cir. 1993) (quoting United States v. Cain, 587 F.2d 678, 682 (5th Cir.), cert. denied, 440 U.S. 975 (1979)).

[15] See Taylor, 210 F.3d at 316.

[16] See United States v. Polasek, 162 F.3d at 886.

16

This is not a case in which the criminal defendant successfully raised an objection grounded in insufficiency of the evidence.[17] Instead, the gravamen of Rodalton's appeal is that the district court erred in allowing the government, through Davis, to present expert testimony in the guise of summary evidence. This is reversible trial error, for which the proper remedy is a remand for a new trial. As the Supreme Court has stated:

> [R]eversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, e.g., incorrect receipt or rejection of evidence.... When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for inuring that the guilty are punished.[18]

We therefore reverse Rodalton Hart's conviction, vacate his

---

[17] Our reference to insufficiency of the evidence in the instant case serves only to show that, absent Davis's testimony and chart — erroneously admitted as summary evidence — the government failed to prove its case through independent evidence.

[18] Burks v. United States, 437 U.S. 1, 15 (1978). See also United States v. Cornett, 195 F.3d 776, 781 n.6 (5th Cir. 1999) (internal quotation marks omitted) (observing, in the context of a determination that the district court erroneously admitted an exhibit under the co-conspirator exception to the hearsay rule, that, "[s]ince we are reversing for a reason other than sufficiency of the evidence, remand is proper because the accused has a strong interest in obtaining a fair readjudication of [her] guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished").

sentence, and remand the case for a new trial.[19]

CONVICTION REVERSED, SENTENCE VACATED, and CASE REMANDED for new trial.

_____

[19] As we reverse on the basis of FRE 1006 and remand for a new trial, we need not and do not reach Rodalton's alternate grounds for appeal: abuse of discretion in removing a juror after the trial had begun; and error in failing to grant a new trial for the government's failure to disclose the true terms of the plea agreement with Harrell Neal.

In addition, our conclusion that the government failed to prove beyond a reasonable doubt that the debts belonged on the FHP obviously bears on the § 1014 conviction directly, but it bears on the § 201(b)(1)(B) conviction indirectly, as well.  As Rodalton explained in his appellate brief:

> The conviction of Mr. Hart on the single count of bribery is also due to be overturned because, without evidence that there was anything improper with the five disputed Farm and Home Plans in this case, it would have been impossible for the United States to establish any bribe.  Simply put, there would be no evidence that Mr. Hart ever received anything of value from Harold [sic] Neal in return for the alleged bribes.