# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 15-41235

United States Court of Appeals
Fifth Circuit

**FILED**

May 19, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

SALVADOR OCAMPO-VERGARA,
  Also Known as Salvador Ocampo, Also Known as Chava;
GUSTAVO ORTIZ-SALAZAR,
  Also Known as Daniel, Also Known as Gus, Also Known as Gustabo,

Defendants–Appellants,

\* \* \* \* \* \* \* \* \*

Consolidated with 15-41286

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

RICARDO ORTIZ-FERNANDEZ, Also Known as Alex,

Defendant–Appellant.

No. 15-41235
Cons. w/ No. 15-41286

Appeals from the United States District Court
for the Eastern District of Texas

Before SMITH and HAYNES, Circuit Judges, and JUNELL, District Judge.*
JERRY E. SMITH, Circuit Judge:

A jury convicted Salvador Ocampo-Vergara, Gustavo Ortiz-Salazar, and Ricardo Ortiz-Fernandez of conspiracy to possess with intent to distribute heroin. They raise various challenges to their convictions. We affirm.

I.

The government introduced testimony from several of the coconspirators. Daniel Castrejon testified about the structure of the drug-trafficking organization. He explained that the Beltran-Levya cartel controlled drug distribution in the Mexican states of Morelos, Guerrero, and Puebla. Castrejon worked for the cell of a cartel in the Beltran-Levya alliance. He knew that a man called "La Chula" also worked for the cartel and that La Chula's job was to send shipments of heroin to the United States.[1] Castrejon's job was to find drivers who were willing to transport drugs into the United States. He reached an arrangement with Ocampo-Vergara whereby Castrejon would pay Ocampo-Vergara 30,000 pesos for each courier he recruited. Couriers were paid $15,000

---

* District Judge of the Western District of Texas, sitting by designation.

[1] La Chula's given name is Rene Romero-Aruajo, but most witnesses referred to him as La Chula.

No. 15-41235
Cons. w/ No. 15-41286

plus $5,000 expense money for each trip.  To reduce suspicion, they were required to register and insure the cars in their own names.  The couriers were generally not informed of the type or quantity of the drugs they were transporting.  The drugs were concealed in hidden compartments, and, depending on the type of vehicle, each shipment of heroin was between six and fifteen kilograms.

Ortiz-Fernandez was in charge of receiving and unloading the cars and then distributing the drugs.  He operated out of Chicago and was responsible for distributing drugs to Chicago, New York, and Texas.  Shipments would arrive in Chicago at least once a week; for each kilogram of heroin that arrived in Chicago, Ortiz-Fernandez was paid $1,000.  Proceeds from sale of the heroin were then sent to Mexico in the same vehicles used to transport the drugs.  Castrejon estimated that he and Ortiz-Fernandez received 100 kilograms of heroin and returned between three and five million dollars to Mexico.

Multiple couriers for the organization corroborated Castrejon's description of Ocampo-Vergara's and Ortiz-Fernandez's roles.  Several of the couriers also described how Ortiz-Salazar participated in driving shipments of drugs and money.  Alejandro Rodriguez, Araceli Gonzalez, and Daniel Vargas described trips they made with Ortiz-Salazar on behalf of the organization.

After an eight-day trial, a jury convicted Ocampo-Vergara, Ortiz-Salazar, and Ortiz-Fernandez—who had been indicted along with four other defendants not parties to this appeal[2]—of conspiracy to possess with intent to distribute one kilogram or more of heroin.  They raise several issues regarding the convictions.

---

[2] Arturo Palacios, Rene Araujo (La Chula), Daniel Vargas, and Noemi Vargas.

No. 15-41235
Cons. w/ No. 15-41286

II.

Ocampo-Vergara contends that there was insufficient evidence for conviction. But he did not properly preserve that issue. Although he joined a motion for judgment of acquittal at the close of the government's case-in-chief, he did not renew the challenge at the close of all evidence.[3] Where no such challenge was made, a defendant, to establish insufficiency, must show that the record is "devoid of evidence pointing to guilt" or is "so tenuous that a conviction is shocking."[4]

"To prove a drug conspiracy, the government must prove that (1) two or more persons, directly or indirectly, reached an agreement to possess with the intent to distribute a controlled substance; (2) the defendant knew of the agreement; (3) the defendant voluntarily participated in the agreement; and (4) the overall scope of the conspiracy involved the drug amount in the charged crime."[5] "A reasonable jury may infer the existence of a conspiracy from the presence, association, and concerted action of the defendant with others."[6] Moreover, we must view all evidence in the light most favorable to the

---

[3] *See United States v. Jimenez*, 509 F.3d 682, 690 (5th Cir. 2007) ("When appellants have preserved their sufficiency argument by moving for judgment of acquittal at the close of the government's case in chief *and* at the close of all the evidence, we review their arguments *de novo*.") (emphasis added); *United States v. Green*, 293 F.3d 886, 895 (5th Cir. 2002) ("Defendants' sufficiency of the evidence claims are reviewed under a stricter than usual standard, because none of the defendants renewed their motions for judgment of acquittal at the close of all evidence."); *United States v. Ruiz*, 860 F.2d 615, 617 (5th Cir. 1988) ("Nestor moved for a judgment of acquittal based on insufficiency of evidence only at the close of the government's evidence, failing to renew this motion at the conclusion of the presentation of his defense. This failure waived any objection to the denial of his motion.").

[4] *United States v. Delgado*, 672 F.3d 320, 331 (5th Cir. 2012) (en banc) (quotation marks, citation, and emphasis omitted)

[5] *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016) (per curiam) (quotation marks omitted and alterations adopted).

[6] *Id.* (quotation marks omitted).

No. 15-41235
Cons. w/ No. 15-41286

government, giving it the benefit of all reasonable inferences and credibility choices.[7]

Far from being "devoid of evidence," the record is replete with evidence that points to Ocampo-Vergara's guilt. Four conspiracy members testified that Ocampo-Vergara recruited them to be couriers and explicitly informed them that they would be transporting drugs. In addition, Castrejon said that he entered an agreement with Ocampo-Vergara whereby Castrejon would pay Ocampo-Vergara 30,000 pesos for each courier whom he recruited. So, although evidence of an express agreement is not required to prove a conspiracy,[8] the record shows that Ocampo-Vergara entered express agreements to distribute heroin.

Numerous couriers also testified that they delivered vehicles to Ocampo-Vergara in Mexico. Ocampo-Vergara then directed the return of those vehicles for trips into the United States; heroin was discovered in several of the vehicles. A jury could reasonably infer that Ocampo-Vergara knew that heroin was concealed inside the cars between the time he received them and the time the couriers retrieved them. Indeed, when one of the couriers noticed a white residue on her returned vehicle and asked Ocampo-Vergara about it, he instructed her to wash it and spray it with perfume. His answer implies knowledge of the drugs.

In sum, Ocampo-Vergara has not overcome the high bar of showing that the evidence was "obviously insufficient." *Delgado*, 672 F.3d at 331 (emphasis

---

[7] *Delgado*, 672 F.3d at 332; *see also United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) ("The jury retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses.") (quotation marks omitted).

[8] *Bowen*, 818 F.3d at 188.

5

No. 15-41235
Cons. w/ No. 15-41286

omitted).  His sufficiency claim fails.

## III.

Ortiz-Salazar asserts that the district court erred by permitting the government to introduce "guilt-by-association" evidence.  He points to (1) testimony about other conspiracy members' arrests; (2) testimony that couriers drove consistent types of vehicles and had similar concealment methods; (3) testimony that Ortiz-Salazar was from the same area of Mexico as several other coconspirators; and (4) questions from the government, in which it described certain witnesses as "known" or "possible" couriers.  But, as we explain, such evidence is perfectly appropriate in a conspiracy case.

"[A] defendant's guilt may not be proven by showing he associates with unsavory characters." *United States v. Singleterry*, 646 F.2d 1014, 1018 (5th Cir. Unit A June 1981).  For example, we found that a prosecutor had elicited impermissible guilt-by-association evidence by asking the defendant if he associated with felons.  *Id.*  And a district court erred by admitting evidence that a defendant's brother had been involved in marihuana smuggling, given that the evidence was "not connected to [the defendant] in any way except for the fact that the seller was his brother."[9]  There are two problems with such guilt-by-association evidence.  First, "it is not relevant as that term is defined in [Federal Rule of Evidence] 401 and hence is inadmissible under [Federal Rule of Evidence] 402." *United States v. Polasek*, 162 F.3d 878, 884 n.2 (5th Cir. 1998).  Second, "even if it is relevant, it is unduly prejudicial and excludible under [Federal Rule of Evidence] 403." *Id.*

---

[9] *United States v. Parada-Talamantes*, 32 F.3d 168, 169–70 (5th Cir. 1994); *see also United States v. McCall*, 553 F.3d 821, 825–27 (5th Cir. 2008) (finding that the prosecution had introduced impermissible guilt-by-association evidence by asking the defendant whether he knew a crack-cocaine dealer and if he knew that the dealer was present at the trial).

No. 15-41235
Cons. w/ No. 15-41286

But, in a conspiracy case, evidence that the defendant was involved with coconspirators is highly relevant. Indeed, "[t]he agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the development and collocation of circumstances."[10] Accordingly, "[p]resence and association with other members of a conspiracy, along with other evidence, may be relied upon to find a conspiracy." *United States v. Casilla*, 20 F.3d 600, 603 (5th Cir. 1994). And though such evidence is certainly prejudicial in the sense that it harms the defendant's case, it is not "unfair[ly]" prejudicial in the sense of Rule 403.[11]

*Polasek* is instructive of the interaction between conspiracy cases and the prohibition on guilt-by-association evidence. There, the defendant was charged with various offenses, including conspiracy, related to odometer tampering. The government elicited testimony that the defendant had done title work for persons later convicted of odometer fraud. *Polasek*, 162 F.3d at 881–83. We held that the testimony was impermissible guilt-by-association evidence because it "showed only that [the defendant] associated with criminals." *Id.* at 885. But, critically, we observed that "the government failed to demonstrate that [the defendant] in fact falsified titles or committed any other crimes *in connection with the convicted associates*." *Id.* (emphasis added). In explaining why the challenged testimony was irrelevant, we noted that "[t]he government never demonstrated that [the defendant] participated in or even

---

[10] *United States v. Romans*, 823 F.3d 299, 311 (5th Cir. 2016) (quotation marks omitted). *See also United States v. Gallardo-Trapero*, 185 F.3d 307, 317 (5th Cir. 1999) ("[I]n meeting its burden, the government may rely on circumstantial evidence tying the defendants together in order to prove conspiracy.").

[11] *See Old Chief v. United States*, 519 U.S. 172, 180 (1997) ("The term 'unfair prejudice' . . . speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt *on a ground different from proof specific to the offense charged*.") (emphasis added).

No. 15-41235
Cons. w/ No. 15-41286

knew of the schemes for which the associates were convicted." *Id.* at 884 n.2. Thus, *Polasek* shows that guilt-by-association problems arise where evidence indicates *only* that a defendant associates with unsavory characters. In contrast, where the defendant's offense is connected to others' conduct, no such problems arise.

All of the evidence Ortiz-Salazar challenges was relevant to showing that he was a member of the conspiracy, and none of it was unfairly prejudicial. Thus, the district court did not err in permitting it.

IV.

Ortiz-Salazar contends that the district court erred by permitting certain testimony from DEA Agent Richard Clough. Testifying as an expert, Clough explained how complex drug-trafficking organizations typically move drugs from Mexico to the United States. He also described specific events from the instant conspiracy, such as the arrests of the testifying couriers. He further explained how the DEA, based on its investigation into Ortiz-Salazar's activities and travel patterns, had come to believe that he too was a drug courier. Ortiz-Salazar maintains that Clough's testimony violated Federal Rule of Evidence 704(b)[12] and our precedents prohibiting evidence of drug-courier profiles.[13]

But Ortiz-Salazar concedes that he did not raise those challenges at trial and that we are thus limited to reviewing for plain error. *See Puckett v. United States*, 556 U.S. 129, 135 (2009). And even assuming that the district court

---

[12] Rule 704(b) prohibits an expert witness from "stat[ing] an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense."

[13] *E.g.*, *United States v. Morin*, 627 F.3d 985, 995 (5th Cir. 2010).

8

No. 15-41235
Cons. w/ No. 15-41286

erred in permitting the challenged portions of Clough's testimony—and assuming that the error was clear—Ortiz-Salazar still has the burden to show that his substantial rights were affected. To meet that burden, he "must show 'a reasonable probability that his trial would have come out differently but for the illegitimate aspects of [Agent Clough's] testimony.'"[14]

Ortiz-Salazar has made no such showing. Even setting aside Clough's challenged testimony, the jury was presented with substantial other evidence that Ortiz-Salazar was a knowing and voluntary participant in the conspiracy.[15] Four coconspirators—each of whom admitted to being a drug courier—testified regarding Ortiz-Salazar's involvement:

- Alejandro Rodriguez said that Ortiz-Salazar asked for a ride to Chicago from Mexico. Rodriguez then explained that the purpose of the trip was to smuggle drugs. Ortiz-Salazar replied that it "[didn't] matter" and requested an introduction to Rodriguez's employer. Ortiz-Salazar then assisted Rodriguez in driving the vehicle to Chicago and received $2,000 for his help.

- Araceli Gonzalez also testified about a trip she made with Ortiz-Salazar. They drove a Chevrolet Malibu—in which Gonzalez was later discovered with heroin—and Ortiz-Salazar told her that he had previously driven the car when transporting "loads." He explained that the Malibu was good for transporting drugs because it did not attract attention.

- Daniel Vargas described how he and Ortiz-Salazar had driven a car

---

[14] *Id.* at 998 (quoting *United States v. Gonzalez-Rodriguez*, 621 F.3d 354, 367 (5th Cir. 2010)).

[15] *See id.* at 999–1000 (holding that a defendant had not shown that drug-courier-profile evidence affected his substantial rights because "[t]he government produced a substantial volume of additional evidence demonstrating [the defendant's] guilty knowledge"); *Gonzalez-Rodriguez*, 621 F.3d at 367–68 (holding the same because "even excluding [the agent's] impermissible testimony, there is still extensive evidence that [the defendant] knew about the drugs . . . .").

No. 15-41235
Cons. w/ No. 15-41286

from Chicago to Los Angeles at Ortiz-Fernandez's instruction. When they arrived in Los Angeles, Ortiz-Salazar called a number, and the two were told to meet an unknown man at a hotel. The man took the car, returned it the next day, and gave them $2,000–$3,000.

- Angelica Campos testified that a coconspirator told her that Ortiz-Salazar was a drug courier and that he worked for Castrejon.

Considering the couriers' testimony, along with the record as a whole, there is no reasonable probability that Ortiz-Salazar's conviction hinged on Clough's challenged testimony. So Ortiz-Salazar has not shown that his substantial rights were affected. He thus has not established plain error.

V.

Ortiz-Fernandez asserts that the district court erred by permitting the government to introduce certain summary charts. The charts represented phone "connections" between and among various coconspirators, including Ortiz-Fernandez. The connections were drawn between names; no phone numbers appeared on the charts. Ortiz-Fernandez contends that the summary charts did not accurately reflect the underlying phone records because those records did not contain phone-subscriber names. He claims that the records provided no basis for the government to tie phone numbers to any particular conspirator.

But even assuming that the court erred in admitting the challenged summary charts, that error was harmless. "A nonconstitutional trial error is harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.'"[16] The admission of improper summary charts is harmless

---

[16] *United States v. Lowery*, 135 F.3d 957, 959 (5th Cir. 1998) (per curiam) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

10

No. 15-41235
Cons. w/ No. 15-41286

if other evidence sufficiently proved the elements of the crime and if the jury was not misled by the charts.[17]

There was overwhelming evidence of Ortiz-Fernandez's guilt. Castrejon testified that Ortiz-Fernandez was in charge of receiving cars, unloading them, and distributing the drugs. He said that Ortiz-Fernandez distributed drugs to Chicago, New York, and Texas and that for each kilogram of heroin that arrived in Chicago, Ortiz-Fernandez was paid $1,000. Castrejon estimated that he and Ortiz-Fernandez received 100 kilograms of heroin and returned between three and five million dollars to Mexico. In addition, many of the couriers identified Ortiz-Fernandez in court and described how he provided them with vehicles and expense money. The couriers also testified to delivering vehicles containing drugs to Ortiz-Fernandez and to receiving payments from Ortiz-Fernandez for those deliveries.

Ortiz-Fernandez points us to several cases in which we held that admission of an improper summary chart was not harmless.[18] But there the government had attempted to use a summary chart to prove an element that it otherwise had not established.[19] Here, in contrast, the government presented

---

[17] *See United States v. Winn*, 948 F.2d 145, 159 (5th Cir. 1991) (holding that improper use of a summary chart was harmless because the evidence was "merely cumulative" and there was "overwhelming evidence" of the charged crime); *United States v. Covarrubia*, 52 F.3d 1068 (5th Cir. 1995) (per curiam) (table) (holding that admission of a summary chart was harmless because "it [was] clear that the summary did not mislead the jury" and "[t]he evidence introduced at trial was more than sufficient to prove the[] elements as to each defendant"). Because *Covarrubia* was issued before January 1, 1996, it is precedential. *See* 5TH CIR. R. 47.5.3.

[18] *See United States v. Hart*, 295 F.3d 451, 458–59 (5th Cir. 2002); *United States v. Taylor*, 210 F.3d 311, 315–16 (5th Cir. 2000).

[19] *See Hart*, 295 F.3d at 458–59 (finding non-harmless error in the admission of a chart that stated that certain debts belonged on a form, when the government had presented no evidence to establish that fact); *Taylor*, 210 F.3d at 316 (finding non-harmless error in the admission of a chart that showed that the defendant had supplied crack cocaine to persons

No. 15-41235
Cons. w/ No. 15-41286

ample evidence to satisfy each of the elements of Ortiz-Fernandez's conspiracy charge. The challenged summary charts served, at most, as cumulative evidence of an agreement or of Ortiz-Fernandez's voluntary participation in it. Indeed, it is unlikely that the jury relied on phone calls to conclude that an agreement existed, given that there was direct testimony from multiple co-conspirators that Ortiz-Fernandez was part of the trafficking organization. Moreover, even if the calls were important to the jury's verdict, numerous witnesses testified to having called Ortiz-Fernandez. In sum, we cannot say that the admission of the summary charts "had substantial and injurious effect or influence in determining the jury's verdict." *Lowery*, 135 F.3d at 959. So any error was harmless.

The judgments of conviction are AFFIRMED.

---

who had testified to the contrary).